363 P.3d 224

MAUNA KEA ANAINA HOU; Clarence Kukauakahi Ching; Flores–Case 'Ohana; Deborah J. Ward; Paul K. Neves; and Kahea: The Hawaiian Environmental Alliance, a domestic non-profit corporation, Appellants–Appellants,

v.

BOARD OF LAND AND NATURAL RESOURCES, State Of Hawai'i; Department of Land and Natural Resources, State of Hawai'i; Suzanne D. Case, in her official capacity as Chair of the Board of Land and Natural Resources and Director of the Department of Land and Natural Resources; and University of Hawai'i at Hilo, Appellees–Appellees. Appellees–Appellees.

No. SCAP–14–0000873.

Supreme Court of Hawai'i.

Dec. 2, 2015.

Richard Naiwieha Wurdeman, for appellants.

Ian L. Sandison, Timothy J. Lui–Kwan, John P. Manaut, and Arsima A. Muller, Honolulu, for appellee University of Hawai'i at Hilo.

Douglas S. Chin, Honolulu, William J. Wynhoff, and Julie H. China, for appellees BLNR, DLNR, and Suzanne D. Case, in her official capacity as Chairperson of the Board.

RECKTENWALD, C.J., NAKAYAMA, and McKENNA, JJ., with POLLACK, J., Concurring Separately, with Whom WILSON, J., Joins, and with Whom McKENNA, J., Joins as to Part IV.

Opinion of the Court by
RECKTENWALD, C.J.

This case requires us to determine whether the procedure followed by the Board of Land and Natural Resources (Board or BLNR) in issuing a permit to construct an observatory in a conservation district[1] comported with due process.

Specifically, the University of Hawai'i at Hilo (UHH) applied for approval from the Board to construct the Thirty Meter Telescope (TMT) on Mauna Kea on the island of Hawai'i. The Board held two public hearings on the application, at which more than 80 people spoke. Proponents asserted that the "next generation" large telescope would facil-

---

1. Hawai'i Revised Statutes (HRS) § 183C–1 (Supp.1994), containing the findings and purpose of Conservation Districts, provides:

The legislature finds that lands within the state land use conservation district contain important natural resources essential to the preservation of the State's fragile natural ecosystems and the sustainability of the State's water supply. It is therefore, the intent of the legislature to conserve, protect, and preserve the important natural resources of the State through appropriate management and use to promote their long-term sustainability and the public health, safety and welfare.

itate cutting-edge scientific research that could not be conducted as effectively anywhere else. Opponents included Native Hawaiians who stated that the summit area was sacred in Native Hawaiian culture and that the construction of the eighteen-and-one-half-story high observatory would be a desecration.

The Board scheduled UHH's application for action at a public board meeting in February 2011. Various opponents of the application spoke at the meeting and requested that the Board delay action on the permit until it could conduct a contested case hearing, at which evidence concerning the application could be presented under oath and subject to cross-examination.

Despite those objections, the Board voted to approve the permit at the meeting, subject to a number of conditions. It also took two further steps that are relevant here. First, acting on its own motion, it directed that a contested case hearing be conducted. Second, it included a condition in the permit that no construction could be undertaken until the contested case hearing was resolved.

Subsequently, the Chair of the Board appointed a hearing officer to conduct the hearing, which took place over the course of seven days in 2011. In 2012, the hearing officer recommended that the permit be approved, subject to essentially the same conditions as originally imposed by the Board. The Board adopted that recommendation in 2013, and the Circuit Court of the Third Circuit affirmed the Board's action. Appellants, who oppose the issuance of the permit and who include several of the people who requested that the Board not act on the application until after the contested case hearing was held, appealed to this court.

The question we must answer is whether the approval of the permit before the contested case hearing was held violated the Hawai'i Constitution's guarantee of due process, which provides that, "No person shall be deprived of life, liberty or property without due process of law . . . ." Haw. Const. art. I, § 5. We hold that it did.

■ A "fair trial in a fair tribunal is a basic requirement of due process." *Sifaga-*
*loa v. Bd. of Trs. of Emps.' Ret. Sys.*, 74 Haw. 181, 189, 840 P.2d 367, 371 (1992) (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). While the specifics of that guarantee can vary depending on the circumstances, in the instant case the Appellants were entitled to a contested case hearing and had unequivocally requested one before the Board voted on the permit at its February 2011 meeting. A contested case hearing is similar in many respects to a trial before a judge: the parties have the right to present evidence, testimony is taken under oath, and witnesses are subject to cross-examination. It provides a high level of procedural fairness and protections to ensure that decisions are made based on a factual record that is developed through a rigorous adversarial process.

By voting on the permit before the contested case hearing was held, the Board denied the Appellants their due process right to be heard at "a meaningful time and in a meaningful manner." *Sandy Beach Def. Fund v. City & Cnty. of Honolulu*, 70 Haw. 361, 378, 773 P.2d 250, 261 (1989). The Board was on record in support of the project, and the permit itself was issued before evidence was taken and subject to adversarial testing before a neutral hearing officer. While UHH and the Board argue that the February 2011 decision was "preliminary" and subject to revision, the fact remains that the Board issued the permit prior to holding the contested case hearing. This procedure was improper, and was inconsistent with the statutory definition of a contested case as "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing." HRS § 91-1(5) (1993) (emphasis added).

Such a procedure lacked both the reality and appearance of justice. As this court noted in *Sifagaloa*:

> The Supreme Court teaches us . . . that justice can "perform its high function in the best way [only if it satisfies] the 'appearance of justice.'" For in a popular government, "'justice must not only be done but must manifestly be seen to be done. . . .'"

74 Haw. at 189–90, 840 P.2d at 371 (quoting *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954), and *Murchison,* 349 U.S. at 136, 75 S.Ct. 623).

The process followed by the Board here did not meet these standards. Quite simply, the Board put the cart before the horse when it issued the permit before the request for a contested case hearing was resolved and the hearing was held. Accordingly, the permit cannot stand.[2] We therefore vacate the judgment of the circuit court and the permit issued by the Board, and remand so that a contested case hearing can be conducted before the Board or a new hearing officer, or for other proceedings consistent with this opinion.

## I. BACKGROUND

### A. BLNR proceedings

#### 1. Conservation District Use Application and Permit

On September 2, 2010, UHH submitted to the Department of Land and Natural Resources a Conservation District Use Application (CDUA) for the TMT. UHH submitted the application on behalf of TMT Observatory Corporation, a private non-profit corporation, which proposed the TMT in partnership with the University of California, the California Institute of Technology, and the Association of Canadian Universities for Research in Astronomy; the National Astronomical Observatory of Japan was noted to be a "collaborator and potential partner," and the National Astronomical Observatories of the Chinese Academy of Sciences and India's Department of Science and Technology were noted to be "observers and potential partners."

The application proposed an astronomy observatory and ancillary facilities and access roads on a site of roughly five acres on the upper slopes of Mauna Kea. The proposed site was within the astronomy precinct of the Mauna Kea Science Reserve, which is within the Conservation District Resource subzone. The CDUA stated that as of mid–2010, thirteen astronomical facilities were operational on Mauna Kea. It explained that observatories were attracted to Mauna Kea "principally because of the superb viewing conditions that its high-altitude/mid-oceanic location provides," and noted the "intellectual and physical support infrastructure that has developed around the [astronomy] complex." The CDUA added that these factors "have helped Hawai'i become one of the most important centers for astronomical research in the world."

The proposed observatory consisted of a telescope thirty meters in diameter, attached instruments to record data, an enclosing dome, an attached building to house support and maintenance facilities, and parking. The CDUA also proposed a TMT Access Way, consisting of an improved road and underground utilities improvements to connect the TMT with other existing roads and utilities, and temporary use of an existing four-acre staging area for materials during construction. The CDUA also proposed to upgrade existing underground electrical wiring, electrical transformers, and related equipment within a nearby substation.

On December 2 and 3, 2010, BLNR held public hearings on the CDUA in Hilo and Kailua–Kona, respectively. Approximately 200 individuals attended the hearings, 84 of whom testified, and a number of individuals and groups provided written comments before and after these hearings. A range of opinions were expressed in support of and against the CDUA, and at least 6 individuals or groups requested a contested case hearing verbally, in writing, or both.

In the weeks that followed, Samuel Lemmo, Administrator of the Office of Conserva-

---

**2.** Appellants also argue that their due process rights under the United States Constitution have been violated, that BLNR's findings and conclusions did not satisfy HAR § 13–5–30(c), the permit lacked an adequate underlying management plan, and BLNR failed to meet its obligations to protect and preserve customary and traditional Native Hawaiian rights. Due to the disposition of this case on a threshold issue, this court does not address Appellants' additional arguments. *See United Pub. Workers, AFSCME Local 646 AFL-CIO v. Hanneman,* 106 Hawai'i 359, 360, 105 P.3d 236, 237 (2005) (declining to address other issues where appeal disposed on a preliminary issue).

tion and Coastal Lands, and Michael Cain, Staff Planner for the Office of Conservation and Coastal Lands, completed a staff report for BLNR that summarized the CDUA and public comments, including the requests for a contested case hearing, and recommended that BLNR approve the CDUA and issue a Conservation District Use Permit (CDUP). The staff report also recommended twenty-one conditions for the permit. Other than noting that requests for a contested case hearing had been received, Lemmo and Cain did not at that time recommend that BLNR hold a contested case hearing.

On February 17, 2011, BLNR advised UHH, Mauna Kea Anaina Hou, Deborah Ward (Chairperson of Sierra Club, Hawai'i Chapter), Miwa Tamanaha (Executive Director of KAHEA), Fred D. Stone, and Clarence Kukauakahi Ching that BLNR would "consider" the application at its regularly-scheduled meeting on February 25, 2011, and would also consider

a request for decision-making by the Board (a) on its own motion hold [sic] a contested case hearing or grant requests by Mauna Kea Anaina Hou, Fred Stone, KAHEA Environmental Alliance, Kukauakahi (Clarence Ching), and Sierra Club for a contested case hearing, and (b) appoint a hearings officer and delegate to the Chairperson the authority to select said hearings officer to conduct all hearings for one (1) contested case hearing.

On February 25, 2011, BLNR's Chair began BLNR's regularly-scheduled public board meeting by asking members of the public to limit their testimonies to no more than five minutes each.

Lemmo then gave a presentation explaining the recommendation for approval of the application and issuance of a permit. A summary of that presentation, as reflected in the meeting minutes, spans nearly five pages single-spaced. He verbally supplemented the staff report with several additional recommended conditions, including the condition that: "If a contested case proceeding is initiated no construction shall occur until a final decision is rendered by the Board in favor of the applicant or the proceeding is otherwise dismissed."

After Lemmo spoke, forty-one individuals testified either for or against the application, which included several more requests for a contested case hearing and objections to BLNR issuing a permit before holding a contested case hearing. For example, Marti Townsend, Program Director of KAHEA: The Hawaiian Environmental Alliance (KAHEA), testified to her belief that before a contested case hearing was held, BLNR could only "defer or deny" issuance of a permit:

She referred to written testimony she submitted earlier pointing out a diagram that explains how the contested case process is supposed to work. There is no arrow from the Board making the decision to contested case decision and back and that's because the contested case hearing process is not a motion for reconsideration. It's not saying hey Board you made a mistake and you need to consider this information and re-vote. It's a process for you to collect information because in these kinds of meetings we only have five minutes to speak we don't get to cross examine witnesses. The actual facts don't get to you, at least not in the way that it should so you can make an informed decision. Today your only options for decision making are to defer the permit until the completion of the contested case or to deny the permit.

Clarence Kukauakahi Ching stated that "BLNR is not ready to grant an unconditional CDUP at this time and shouldn't be. A conditional CDUP might work in the interim."

Kealoha Pisciotta, President of Mauna Kea Anaina Hou, explained to BLNR:

[W]e've asked for a contested case hearing. . . . The procedural problem here is that a contested case hearing has to go before a permit approval. . . . [T]he reason is because contested case hearings is [sic] to make sure citizens like us that don't have standing don't have to go into court. The contested case hearing is a process whereby you're allowed to present facts and information to the decision makers (the Board) via the hearing process so you can make an informed decision. But, if

you make your decision before like if it is approved today then you grant the contested case hearing. [sic] There is no point.... What I am asking you guys is to consider that we don't put process "B" before process "A"? It is equivalent to a Judge ruling before he has the evidence so I don't know why it's gone on like this, but we've had this problem before....

Jonathan Osorio, a University of Hawai'i at Mānoa Professor of Hawaiian Studies and board member of KAHEA, also objected to issuing a permit before a contested case hearing. Professor Osorio explained that although he was not a religious practitioner, he was deeply concerned as a historian of how telescopes have "proliferated" on Mauna Kea, and was also concerned by what he believed was an insufficient amount of revenues received from this type of project. Professor Osorio compared BLNR to konohiki[3] and ali'i,[4] who were faced with decisions to allocate resources, including "how they were used to develop." He cautioned:

You have a difficult decision to make here. It may very well be that what we need to do is look at this and give a contested case hearing a chance to present more information, more facts and more people having access to give these kinds of testimonies before you can make a decision. We definitely do not believe that you should make a decision today.

BLNR member Robert Pacheco asked Lemmo to respond to these comments that a contested case hearing must occur before BLNR decided. Lemmo responded:

[W]e have old rules Chapter 13–1, Rules of Practice and Procedure which have a section on the conduct of the contested case hearings. Under these old rules which are no longer in effect and have been replaced, an entity could ask for a contested case hearing at the required public hearing for the project which occurred long before this came before this body. The practice had developed of having a contested case when somebody asked for a contested case at the

public hearing for the CDUP which is long before a decision is made. The rules were changed about five or six years ago which essentially seemed to now allow the Board to make a decision even with a pending request for a contested case hearing before you. Should a contested case hearing be required or held after that you go through that process and it would come back to you (the Board) again and you would rule on that.

BLNR then voted unanimously to approve the application and issue a permit. BLNR adopted the conditions recommended in the staff report and the additional conditions that Lemmo recommended at the meeting, including the condition that, "If a contested case proceeding is initiated, no construction shall occur until a final decision is rendered by the Board in favor of the applicant or the proceeding is otherwise dismissed."

Pisciotta then asked whether, in the event a contested case hearing occurred and the hearing officer disagreed with issuance of the permit, BLNR would "rescind the permit that they just approved[,]" and questioned how BLNR would prevent construction. BLNR minutes reflect the following response:

Chair Aila said that with regards to the [construction] one of the conditions of the CDUP that they just approved is that no construction can begin until the contested case hearing is adjudicated. Mr. Lemmo said final decision making has been made. Chair Aila said there are no bulldozers up there. There is a difference of opinion on how those rules are applied. Ms. Pisciotta agreed which will be figured out by the court. Still the purpose is to allow the decision makers to make an informed decision and you can't make an informed decision unless you have all the information at hand that is why we are suppose [sic] to have contested hearings before we have decision making because a contested case hearing is not a motion for reconsideration. Member Pacheco said this body makes

---

3. Konohiki is defined as "Headman of an ahupua'a land division under the chief[.]" Mary Kawena Pukui & Samuel H. Elbert, *Hawaiian Dictionary* 166 (rev. ed. 1986).

4. Ali'i is defined as "Chief, chiefess, officer, ruler, monarch, peer, headman, noble, aristocrat, king, queen, commander[.]" Pukui & Elbert, *Hawaiian Dictionary*, at 20.

decisions all the time that can go into contested case hearing and comes back to us right away.

(Emphasis added).

Subsequently, at this same meeting, BLNR voted unanimously to hold a contested case hearing.

A few days later, in correspondence dated March 3, 2011, regarding "Conservation District Use Permit (CDUP) HA–3568," BLNR formally advised UHH that "on February 25, 2011, the Board of Land and Natural Resources approved Conservation District Use Permit (CDUP) HA–3568 for the Thirty Meter Telescope at the Mauna Kea Science Reserve," subject to conditions. BLNR included the same conditions that were approved at the February 25, 2011 meeting.

Pertinent conditions included:

5. Before proceeding with any work authorized by the Board, the applicant shall submit four copies of the construction and grading plans and specifications to the Chairperson or his authorized representative for approval for consistency with the conditions of the permit and the declarations set forth in the permit application. Three of the copies will be returned to the applicant. Plan approval by the Chairperson does not constitute approval required from other agencies;

6. All representations relative to mitigation set forth in the Environmental Impact Statement and Conservation District Use Application are incorporated as conditions of the permit;

7. All mitigation measures and management actions contained in the Historic Preservation Mitigation Plan, Construction Plan, Historical & Archaeological Site Plan, Maintenance Plan, and Anthropod Monitoring Plan, are incorporated as conditions of this permit;

. . .

9. The TMT Management Plan is approved, including all specific management actions articulated in the TMT Management Plan including, Cultural Resources Management, Natural Resources Management, Education & Outreach, Astronomical Resources, Permitting and Enforcement,

Infrastructure and Maintenance, Construction Guidelines, Site Recycling, Decommissioning, Demolition & Restoration, Future Land Uses, and Monitoring, Evaluation & Updates. These management actions and their associated mitigation measures are incorporated as conditions of this permit;

10. The following additional conditions shall be implemented by OMKM and TMT:

. . .

● Working with OMKM to develop and implement a habitat restoration study;

. . .

● Providing $1 million annually, adjusted for inflation, for "Community Benefits Package" which will commence with construction and continue through the term of the sublease. The package will be administered via The Hawaiʻi Island New Knowledge (THINK) Fund Board of Advisors; and

● Partnering with other institutions to implement a Workforce Pipeline Program, headed by at least one full-time position through the Community Outreach office, to prepare local residents for jobs in science, engineering, and technical fields;

. . .

● The applicant will present a plan for handling approval prior to beginning construction;

. . .

● The Archaeological Monitoring Plan will be submitted to the State Historic Preservation Division for review and approval prior to the onset of construction;

. . .

15. The applicant understands and agrees that this permit does not convey any vested rights or exclusive privilege;

16. In issuing this permit, the Department and Board have relied on the information and data that the applicant has provided in connection with this permit application. If, subsequent to the issuance of this permit, such information and data prove to be false, incomplete or inaccurate, this permit may be modified, suspended or revoked, in whole or in part, and/or the Department may, in addition, institute appropriate legal proceedings;

. . .

20. No construction work shall be initiated until the applicant demonstrates compliance with all pre-construction conditions and mitigation measures outlined in this report. Once this condition has been satisfied, the Department will issue notice to proceed with construction;

21. If a contested case proceeding is initiated, no construction shall occur until a final decision is rendered by the Board in favor of the applicant or the proceeding is otherwise dismissed;

. . .

25. Failure to comply with any of these conditions shall render this Conservation District Use Permit null and void.

This correspondence further asked UHH to acknowledge receipt of "this approval," and advised that BLNR had decided to hold a contested case hearing.

## 2. Contested Case Hearing

Beginning in August 2011, a hearing officer appointed by BLNR's Chair presided over a contested case hearing, during which voluminous written direct testimony was admitted, and twenty-six witnesses, under oath, testified and were cross-examined. The following is a brief summary of the issues raised by the evidence and arguments presented.

Perry White, the principal author of UHH's application, testified that in crafting the application, he relied upon the final environmental impact statement (FEIS) that had been approved by the Governor in 2010 and the Mauna Kea Comprehensive Management Plan and its four sub-plans, the Natural Resources Management Plan, the Cultural Resources Management Plan, the Decommissioning Plan, and the Public Access Plan. White further testified to the reasons he believed that TMT satisfied HAR § 13–5–30(c),[5] which contains criteria for BLNR's approval of a permit, and in particular, how he believed that the TMT project would not cause "substantial adverse impact." White also testified regarding future decommissioning of Mauna Kea observatories, including TMT.

Dr. Gary Sanders, the TMT Project Manager, testified that TMT's design was developed in consultation with the Office of Mauna Kea Management. He testified extensively regarding measures intended to mitigate the impact of TMT, including a reflective exterior dome that fit tightly around the telescope to minimize visual impact. Dr. Sanders also testified that TMT was designed for a service lifetime of fifty years, while acknowledging that UH's lease of the land from the State expired in 2033. Dr. Sanders also responded to questions regarding whether TMT would cause a permanent alteration or disturbance to the natural landscape at the TMT site, acknowledging that "there will likely be some permanent alteration."

James Hayes, of an engineering firm contracted to prepare the FEIS, testified regarding the anticipated visual impact, level of "cumulative impact" in light of existing telescopes on Mauna Kea, and several mitigation measures incorporated in the design of TMT. More specifically, Hayes testified

---

**5.** HAR § 13–5–30(c) provides:

In evaluating the merits of a proposed land use, the department or board shall apply the following criteria:
(1) The proposed land use is consistent with the purpose of the conservation district;
(2) The proposed land use is consistent with the objectives of the subzone of the land on which the use will occur;
(3) The proposed land use complies with provisions and guidelines contained in chapter 205A, HRS, entitled "Coastal Zone Management", where applicable;
(4) The proposed land use will not cause substantial adverse impact to existing natural resources within the surrounding area, community, or region;

(5) The proposed land use, including buildings, structures, and facilities, shall be compatible with the locality and surrounding areas, appropriate to the physical conditions and capabilities of the specific parcel or parcels;
(6) The existing physical and environmental aspects of the land, such as natural beauty and open space characteristics, will be preserved or improved upon, whichever is applicable;
(7) Subdivision of land will not be utilized to increase the intensity of land uses in the conservation district; and
(8) The proposed land use will not be materially detrimental to the public health, safety, and welfare.

that TMT would add only a "limited increment to the level of cumulative impact that currently exists on Mauna Kea, but it will not tip the balance of any assessed impact from a level that is currently less than significant to a significant level." Indeed, the FEIS stated, "From a cumulative perspective, the impact of past and present actions on cultural, archaeological, and historic resources is substantial, significant, and adverse; these impacts would continue to be substantial, significant, and adverse with . . . [TMT] and other reasonably foreseeable actions." Hayes further testified that placing TMT on a recycled telescope site was considered but ultimately deemed "not feasible."

Wallace Ishibashi, Jr., a member of the Kealoha Poli'ahu family, a lineage traditionally recognized as descendants of Poli'ahu, a snow goddess of Mauna Kea, testified that upon asking Poli'ahu whether TMT was "compatible with the sacred landscape," he was informed that "it was okay." Ishibashi further testified in writing that due to his experience learning from navigator Nainoa Thompson and from his grandfather about the stars and the moon and the importance of the study of the heavens to ancient Hawaiians, he supported the TMT because he believed that it would help his grandchildren "learn more about ourselves, our God, and what's out there beyond the stars that we can see with only our eyes." He compared TMT's advanced search for knowledge and understanding to a search for the aumakua or ancestral origins of the universe, and expressed disagreement with those who "oppose[d] things like the TMT on Mauna Kea just because it's a modern thing, as Hawaiians have always been a creative and adaptive people."

Kealoha Pisciotta explained in her opening statement that in Native Hawaiian cosmology, Mauna Kea is an origins place. "[I]t's where the heaven and the earth come together, where all life forms originated from. . . . It is a temple, but one not made by man but for man, so that man could learn the ways of the heavens and the laws of this earth, which mean how do we live with each other; how do we live in relationship to the earth; how do we live in relationship to the heaven."

Dr. J. Kehaulani Kauanui, a Professor of Anthropology and American Studies at Wesleyan University, testified that telescope development on Mauna Kea had "proliferate[d]" beyond levels anticipated in the general lease from the State and the 1983 Master Plan for Mauna Kea. Professor Kauanui added that TMT constituted 21st century colonialism, and that observatories on Mauna Kea "literally supplant our indigenous temple of worship," and are a "desecration."

Marti Townsend, Program Director of KAHEA: The Hawaiian Environmental Alliance, testified that TMT would negatively affect the viewplanes of cultural practitioners, and that telescopes on Mauna Kea negatively affected cultural practices and the environment. Townsend further testified that the mitigation measures proposed did not address "substantial adverse impacts" identified in the FEIS and CDUA because the majority of the measures were only indirect, speculative, and beneficial to "particular groups."

In closing, Appellants and UHH presented arguments, among other things, regarding whether Appellants' due process rights had been violated. Pisciotta argued:

I have to note here that in this case BLNR approved the TMT CDUA prior to conducting a contested case hearing, which we believe violated our due process rights, potentially shifting the burden of proof, and thereby forcing us to have to change BLNR's mind, rather than BLNR listening with an open mind to hear all evidence.

UHH responded as follows:

Let me start with the claim that somehow the Applicant has relied on the approval of the CDUA for the CDUP for the permit in February. Again, we never relied on that. In fact, we agreed—we accepted the condition where there would be no action taken on it. In fact, we never raised that as an issue in terms of certain things that we accepted.

And we didn't shift—the burden of proof did not shift. The University agreed and has continued to agree to accept the burden of proof of the eight criteria for the issuance of a CDUP which we believe the

record has clearly shown, and the evidence that was submitted clearly supports the issuance of a CDUP.

On November 30, 2012, the hearing officer issued his 124–page findings of fact, conclusions of law, and decision and order, which stated that "the CDUA is GRANTED, and a Conservation District Use Permit is issued," subject to conditions. Other than omission of the condition that if a contested case hearing be held, then construction shall be stayed, all conditions in the hearing officer's order were virtually the same as those in BLNR's March 3, 2011 letter nearly twenty-one months earlier. As germane to the issue before this court, the hearing officer concluded that BLNR's approval of the permit prior to the contested case hearing was consistent with HAR § 13–1–28(b) (2009).[6] Appellants objected to this and other findings and conclusions before BLNR. Voluminous briefings were filed and BLNR held a hearing.

On April 12, 2013, BLNR issued its 126–page findings of fact, conclusions of law, and decision and order (BLNR's FOFs/COLs/D&O), stating that "the CDUA is GRANTED, and a Conservation District Use Permit is issued," subject to conditions. In appearance and substance, BLNR's FOFs/COLs/D&O is substantially the same as the hearing officer's findings, conclusions, and decision and order.

BLNR addressed Appellants' procedural argument by characterizing the February 25, 2011 decision as a "preliminary ruling" that complied with the Department of Land and Natural Resources' (DLNR) Rules of Practice and Procedure, including HAR § 13–1–28(b). BLNR concluded that there was no due process violation because (1) the February 25, 2011 meeting was a "preliminary approval" and not a "final agency action," (2) the "preliminary approval" was conditioned upon the outcome of the contested case hearing and thus gave Appellants an opportunity to be heard, and (3) the prescribed sequence in the procedural rule was followed because

public hearings preceded the contested case hearing:

[COL] 225. In a preliminary ruling by the BLNR, the CDUP was granted and the following condition was simultaneously imposed by the BLNR: "If a contested case proceeding is initiated, no construction shall occur until a final decision is rendered by the Board in favor of the applicant or the proceeding is otherwise dismissed." Immediately thereafter, on its own motion, the BLNR voted to direct that a contested case be held, and provided a date for interested parties to petition to participate in the contested case. The condition quoted above is formalized as Condition 21 in the BLNR's March 3, 2011 letter to the University. Thus, the BLNR retained responsibility to review and accept, reject, or modify the Hearing Officer's proposed findings and conditions. By immediately ordering that a contested case be held and prohibiting construction until, if ever, it rendered its "final decision" in favor of the applicant following the conclusion of the contested case proceeding, the BLNR demonstrated that its February 25, 2011 vote and subsequent March 3, 2011 letter constituted a preliminary ruling and did not reflect any final agency action.

. . .

[COL] 228. In their brief in the contested case proceeding, [Appellants] did not argue that the contested case hearing should have been held before the BLNR voted on the CDUA. They did, however, mention that issue, at least in passing, during closing arguments. [Appellants'] position is not supported by the DLNR's Rules of Practice and Procedure, which specifically provide for a contested case hearing to occur after the public hearing on the matter, and not before. Thus, Haw. Admin. R. § 13–1–28(b) states: "The contested case hearing shall be held after any public hearing which by law is required to be held on the same subject matter." (Emphasis added [sic].) [7] The order of proceedings here complied with that rule.

---

6. HAR § 13–1–28(b) provides: "The contested case hearing shall be held after any public hearing which by law is required to be held on the same subject matter."

7. This portion of BLNR's FOFs/COLs/D&O contains no emphasis.

[COL] 229. In any event, [Appellants] cannot plausibly claim that they have been deprived of due process or, indeed, that they have suffered any harm at all by the order of proceedings. The condition imposed by the BLNR and quoted above mandated that no work be done on the TMT Project until the contested case has concluded and the BLNR has finally resolved the matter in UHH's favor. That condition has been honored. The Hearing Officer was promptly appointed, and the contested case was held in due course. The Project remains in abeyance pending the outcome of this process. The BLNR must still vote on this matter. The BLNR has at all times retained the authority to review and accept, reject, or modify the Hearing Officer's proposed findings and conclusions, and until the BLNR has voted again, there has been no final agency action on this application. For all practical purposes, [Appellants] are exactly where they would have been if the process had not followed the BLNR's Rules of Practice and Procedure, but instead had occurred in the manner they desired.

(Internal exhibit citation omitted).

## B. Appeal and secondary appeal

Appellants appealed BLNR's FOFs/COLs/D&O to the circuit court, continuing to argue that BLNR's approval of the CDUA and issuance of the CDUP before a contested case hearing was inconsistent with Appellants' rights to due process and pertinent statutes and rules.

On May 5, 2014, the circuit court entered a decision and order affirming BLNR's FOFs/COLs/D&O, and entered final judgment.[8] The circuit court reasoned that "BLNR granted a contested case hearing essentially simultaneously with the preliminary grant of the CDUP[,]" and that the 2011 "preliminary grant" "depended upon a final grant of the permit after a contested case hearing." In addition, the circuit court reasoned that the "preliminary grant" in 2011 "did not have such a legal consequence" that a contested case hearing was required to have preceded it, and Appellants were not prejudiced be-

cause a contested case hearing was held and construction had been stayed. Appellants appealed and sought transfer to this court, which we granted.

## II. STANDARD OF REVIEW

■ In this secondary appeal, this court applies the standards of HRS § 91–14(g) to determine whether the circuit court decision was right or wrong. *Korean Buddhist Dae Won Sa Temple of Hawai'i v. Sullivan,* 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998). HRS § 91–14(g) (Supp.2015) provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Further, "[u]nder HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6)." *Bragg v. State Farm Mut. Auto. Ins. Co.,* 81 Hawai'i 302, 305, 916 P.2d 1203, 1206 (1996).

## III. DISCUSSION

### A. Due process of law

■ The Hawai'i Constitution provides, "No person shall be deprived of life, liberty

---

8. The Honorable Greg K. Nakamura presided.

or property without due process of law...." Haw. Const. art. I, § 5. Due process "calls for such procedural protections as the particular situation demands." *Sandy Beach Def. Fund,* 70 Haw. at 378, 773 P.2d at 261 (citations and internal quotations omitted). The requirements of due process are flexible and depend on many factors, but "there are certain fundamentals of just procedure which are the same for every type of tribunal and every type of proceeding[,]" including those before administrative agencies. *Sifagaloa,* 74 Haw. at 189, 840 P.2d at 371 (quoting *Sussel v. City & Cnty. of Honolulu Civil Serv. Comm'n,* 71 Haw. 101, 107, 784 P.2d 867, 870 (1989)).

 The basic elements of procedural due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Sandy Beach Def. Fund,* 70 Haw. at 378, 773 P.2d at 261; *In re Guardianship of Carlsmith,* 113 Hawai'i 236, 240, 151 P.3d 717, 721 (2007) (due process "afford[s] [interested parties] an opportunity to present their objections"). However, while "a fair trial in a fair tribunal is a basic requirement of due process," *Sifagaloa,* 74 Haw. at 189, 840 P.2d at 371 (quoting *Murchison,* 349 U.S. at 136, 75 S.Ct. 623 (internal quotation marks omitted)), giving a person "a day in court" does not alone mean that a process is fair, *State v. Brown,* 70 Haw. 459, 463, 776 P.2d 1182, 1185 (1989).

 Fundamentally, in the justice system, "justice can perform its high function in the best way only if it satisfies the appearance of justice." *Sifagaloa,* 74 Haw. at 189, 840 P.2d at 371 (quoting *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954)) (internal quotation marks and brackets omitted; emphasis added).

> In the administration of justice by a court of law, no principle is better recognized as absolutely essential than that every case, be it criminal or civil, and the parties involved therein are entitled to the "cold neutrality of an impartial judge." ... In the words of Mr. Justice Cardozo, ... "But justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is

narrowed to a filament. We are to keep the balance true."

*Peters v. Jamieson,* 48 Haw. 247, 262–63, 397 P.2d 575, 585 (1964) (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 122, 54 S.Ct. 330, 78 L.Ed. 674 (1934)).

 This means that the manner in which the justice system operates must be fair and must also appear to be fair. *Sifagaloa,* 74 Haw. at 190, 840 P.2d at 371 ("[J]ustice must not only be done but must manifestly be seen to be done[.]") (quotations omitted). Indeed, this "stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." *Murchison,* 349 U.S. at 136, 75 S.Ct. 623. These principles of the justice system—mandated by the United States and Hawai'i Constitutions, statutes, administrative rules, and decisions by the courts—are manifested in procedural protections.

 In an adjudicatory proceeding before an administrative agency, due process of law generally prohibits decisionmakers from being biased, and more specifically, prohibits decisionmakers from prejudging matters and the appearance of having prejudged matters. *See Sussel,* 71 Haw. at 109, 784 P.2d at 871 (concluding that where an adjudicator's actions while presiding over a matter gave rise to an appearance of impropriety, the circuit court erred in not enjoining the adjudicator from deciding the case); *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) ("Not only is a biased decisionmaker constitutionally unacceptable, but 'our system of law has always endeavored to prevent even the probability of unfairness.'") (quoting *Murchison,* 349 U.S. at 136, 75 S.Ct. 623); *see also Cinderella Career & Finishing Schs., Inc. v. F.T.C.,* 425 F.2d 583, 591 (D.C.Cir.1970) (holding that the standard for evaluating the existence of improper prejudgment in an adjudicative context is whether "a disinterested observer may conclude that (the agency) has in some measure adjudged the facts as well as the law of a

particular case in advance of hearing it").[9]

"Indeed, if there exists any reasonable doubt about the adjudicator's impartiality at the outset of a case, provision of the most elaborate procedural safeguards will not avail to create [an] appearance of justice." *Sussel*, 71 Haw. at 108, 784 P.2d at 870 (quoting M. Redish & L. Marshall, *Adjudicatory Independence and the Values of Procedural Due Process*, 95 Yale L.J. 455, 483–84 (1986)); *see Sifagaloa*, 74 Haw. at 190, 840 P.2d at 371 (same); *see also Cinderella*, 425 F.2d at 590 (disapproving of circumstances "which give the appearance that [a decisionmaker] has already prejudged the case and that the ultimate determination of the merits will move in predestined grooves"). It is abundantly clear that "[f]ew situations more severely threaten trust in the judicial process than the perception that a litigant never had a chance" due to "some identifiable potential bias." Redish & Marshall, *Adjudicatory Independence*, 95 Yale L.J. at 483 (emphasis in original); *see Williams–Yulee v. Florida Bar*, —— U.S. ——, 135 S.Ct. 1656, 1666, 191 L.Ed.2d 570 (2015) (stating that "public perception of judicial integrity" is a governmental interest of "the highest order") (quotations omitted).

Thus, this court must determine whether Appellants were given an opportunity to be heard at a meaningful time and in a meaningful manner when—despite their pending requests for a contested case hearing and specific requests to not issue a permit before such hearing—BLNR issued the permit before resolving those requests and conducting a contested case hearing.

 "A contested case is an agency hearing that 1) is required by law and 2) determines the rights, duties, or privileges of specific parties." *Pele Def. Fund v. Puna Geothermal Venture*, 77 Hawaiʻi 64, 67, 881 P.2d 1210, 1213 (1994); *see* HRS § 91–1(5). An agency hearing that is required by law "may be required by (1) agency rule, (2) statute, or (3) constitutional due process."

*Kaniakapupu v. Land Use Comm'n*, 111 Hawaiʻi 124, 132, 139 P.3d 712, 720 (2006).

 It is undisputed that Appellants were entitled to a contested case hearing. BLNR recognized as much when it voted unanimously to hold a contested case hearing after approving the permit. Indeed, a contested case hearing was required as a matter of constitutional due process. The right to exercise Native Hawaiian customs and traditions is explicitly protected by article XII, section 7 of the Hawaiʻi Constitution:

> The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupuaʻa tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

Appellants have argued throughout this case that the project will have significant negative effects on their Native Hawaiian cultural practices on Mauna Kea. For example, Appellant Neves testified that "[TMT] development in my sacred temple of religious practice will seriously interfere with my ability to adore Mauna Kea." And in a jointly submitted letter, Appellant Mauna Kea Anaina Hou, Appellant Clarence Kukauakahi Ching, The Royal Order of Kamehameha, and Sierra Club wrote, "Mauna Kea is considered the Temple of the Supreme Being[,] the home of Na Akua (the Divine Deities), Na ʻAumakua (the Divine Ancestors), and the meeting place of Papa (Earth Mother) and Wakea (sky Father)."

Given the substantial interests of Native Hawaiians in pursuing their cultural practices on Mauna Kea, the risk of an erroneous deprivation absent the protections provided by a contested case hearing, and the lack of undue burden on the government in affording Appellants a contested case hearing, a contested case hearing was "required by law" regardless of whether BLNR had voted to approve one on its own motion at the February 25, 2011 meeting.[10] *See Sandy Beach Def. Fund*, 70 Haw. at 378, 773 P.2d at 261.

9. UHH argues that the *Cinderella* standard is "obsolete and generally rejected." As explained in Section C, UHH is incorrect. The *Cinderella* standard continues to be widely accepted across

the country, and moreover, is consistent with Hawaiʻi Supreme Court decisions.

10. Moreover, Appellees never disputed Appellants' standing to assert article XII, section 7

Once a contested case hearing is mandated, due process requires that the parties be given a meaningful opportunity to be heard. *See Application of Hawai'i Elec. Light Co.*, 67 Haw. 425, 430, 690 P.2d 274, 278 (1984). In this case, BLNR's decision to vote on the permit prior to the contested case hearing denied Appellants a meaningful opportunity to be heard in both reality and appearance.

A contested case hearing affords parties extensive procedural protections similar to those afforded parties in a civil bench trial before a judge. These protections include the opportunity to issue subpoenas for witnesses to testify under oath or produce documents, to cross-examine witnesses under oath, and to present evidence by submitting documents and testimony under oath in support of their positions. *See* HAR §§ 13–1–32(c), (g); 13–1–33(a), (b); 13–1–35. Moreover, a contested case hearing affords parties the opportunity to obtain and utilize the assistance of counsel, comment on how a site visit by the hearing officer should be conducted, review the written decision of the hearing officer, and challenge the hearing officer's decision both in writing and verbally at a hearing before BLNR.

These procedures are designed to ensure that the record is fully developed and subjected to adversarial testing before a decision is made. Yet that purpose is frustrated if, as was the case here, the decisionmaker rules on the merits before the factual record is even developed. Such a process does not satisfy the appearance of justice, since it suggests that the taking of evidence is an afterthought and that proceedings were merely "mov[ing]" in predestined grooves." *Cinderella*, 425 F.2d at 590; *see Sandy Beach Def. Fund*, 70 Haw. at 378, 773 P.2d at 261. In this case, the procedural protections that were afforded during the contested case process simply cannot remedy the fact that the decisionmaker appeared to have already decided and prejudged the matter at the outset. Decisionmakers cannot decide matters on the merits before taking evidence.

rights and to file this appeal.

Such a process threatens the reality of justice as well. As well-intentioned as the hearing officer may be, he or she knows BLNR's position on the permit before the first witness is sworn in. *See Murchison*, 349 U.S. at 136, 75 S.Ct. 623 (explaining that the "stringent rule [to avoid the appearance of prejudgment] may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties"). BLNR members were of course aware of the prior vote when the hearing officer's recommendation came before them.

BLNR's procedure in this case was also inconsistent with the statutory definition of a contested case hearing. HRS § 91–1(5) defines a contested case as "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing." (Emphasis added). Plainly, BLNR should not have voted on the permit when it did.

In sum, BLNR put the cart before the horse when it approved the permit before the contested case hearing was held. Once the permit was granted, Appellants were denied the most basic element of procedural due process—an opportunity to be heard at a meaningful time and in a meaningful manner. Our Constitution demands more.

## B. BLNR's February 25, 2011 decision was a determination on the merits

BLNR and UHH argue that the February 25, 2011 vote was merely preliminary and tentative pending a contested case hearing and repeat vote by BLNR. To be clear, BLNR's approval of the permit—"preliminary" or not—before the contested case hearing was held violated Hawaii's constitutional guarantee of due process. Regardless, the record indicates that BLNR issued a permit on that day that was operative and determined UHH's rights and responsibilities, although with some aspects stayed pending further action.

BLNR's letter to UHH on March 3, 2011 stated that "on February 25, 2011, the Board

of Land and Natural Resources approved Conservation District Use Permit (CDUP) HA–3568 for the Thirty Meter Telescope at the Mauna Kea Science Reserve," subject to conditions. The permit contained 25 conditions for TMT, and Condition 10 contained 18 bullet points of apparent sub-conditions. As noted below, many of the conditions denominated the permit as "the" permit, and not merely a "preliminary" permit. Specifically, conditions stated: that representations in the environmental impact statement and CDUA "are incorporated as conditions of the permit[,]" (Condition 6); mitigation measures and management actions contained in other plans submitted with the CDUA "are incorporated as conditions of this permit[,]" (Condition 7); the TMT Management Plan, which was submitted with the CDUA, "is approved," and it and related plans "are incorporated as conditions of this permit[,]" (Condition 9); UHH understood and agreed that "this permit" did not convey vested rights[,] (Condition 15); "[i]n issuing this permit," DLNR and BLNR relied upon the CDUA, and "[i]f, subsequent to the issuance of this permit, such information and data prove to be false, incomplete or inaccurate, this permit may be modified....[,]" (Condition 16); and failure to comply with "any of these conditions shall render this Conservation District Use Permit null and void[,]" (Condition 25). Thus, "the permit" was effective as of February 25, 2011, and contained conditions that detailed when and how the permit holder could act. Quite simply, "the permit" was issued as of that date.

BLNR and UHH argue that despite the 2011 permit's repeated statement that it is "the permit," the 2011 permit was only preliminary because construction was stayed pursuant to the condition that, "If a contested case proceeding is initiated, no construction shall occur until a final decision is rendered by the Board in favor of the applicant or the proceeding is otherwise dismissed[,]" (Condition 21). However, construction was stayed due to a number of conditions, not only Condition 21. Specifically, various conditions explained that construction could not begin immediately because: UHH was re-quired to submit construction and grading plans and specifications for approval and consistency with the "conditions of the permit and the declarations set forth in the permit application[,]" (Condition 5); UHH needed to submit for review and approval plans for handling recreational parking during construction and monitoring archaeological sites[,] (Condition 10); and UHH was required to "demonstrate[ ] compliance with all pre-construction conditions and mitigation measures outlined in this report. Once this condition has been satisfied, the Department will issue notice to proceed with construction[,]" (Condition 20). Indeed, these conditions preventing immediate construction in 2011 were repeated in the document that UHH and BLNR characterize as the operable permit—BLNR's FOFs/COLs/D&O in 2013. Thus, a stay on construction beginning immediately did not render the 2011 permit anything less than an operative permit that was issued on the merits of the CDUA.

Further, at least one condition—the annual funding for a community benefits package, (Condition 10)—was to "commence with construction." That this condition would commence with construction also suggests that even without construction, the application had been approved and a permit had been issued. If there was no operative permit until construction could begin, then it would not be reasonable or necessary to explain that funding the community benefits package need not begin until construction begins, meanwhile authorizing other aspects to commence immediately.[11]

Indeed, the February 2011 permit authorized at least some aspects of TMT to commence immediately. For example, one condition stated: "The following additional conditions shall be implemented by OMKM [the Office of Mauna Kea Management] and TMT: ... Working with OMKM to develop and implement a habitat restoration study; ... Partnering with other institutions to implement a Workforce Pipeline Program, headed by at least one full-time position through the Community Outreach office, to

---

11. It is also notable that in 2011 and 2013 the permit was given the same number (HA–3568).

This further suggests that the 2011 permit was indeed an operative permit.

prepare local residents for jobs in science, engineering, and technical fields[,]" (Condition 10). The permit did not stay these conditions, which are unrelated to construction. That the permit authorized aspects of TMT to commence immediately underscores that the effect and apparent intention of issuing the permit was a determination on the merits of the CDUA. The circuit court erred in concluding that the 2011 permit "did not have such a legal consequence" that a contested case was required to have preceded it.

Despite the above, BLNR and UHH also contend that the 2011 permit was only preliminary because a few minutes after BLNR issued the permit, BLNR decided to hold a contested case hearing. But, simply stated, sequence matters. Here, BLNR issued the permit despite pending requests for a contested case hearing and a right to such a hearing under the applicable rules and the Hawai'i Constitution, and only then decided to hold the hearing. This sequence plainly gives rise to the appearance of prejudgment and did not provide Appellants with a meaningful opportunity to be heard.

Further, the conditions enunciated in BLNR's FOFs/COLs/D&O in 2013 are virtually the same as those in the 2011 permit. This similarity is significant because BLNR appears to suggest that in 2011, BLNR anticipated serious consideration of evidence presented during the contested case hearing. But the similarity between the 2011 permit and the 2013 decision gives the appearance that less than full consideration was given to the voluminous legal and factual arguments and materials presented in the contested case hearing. Such similarity "give[s] the appearance that [BLNR] ha[d] already prejudged the case and that the ultimate determination of the merits [had] move[d] in predestined grooves." *Cinderella*, 425 F.2d at 590.

In sum, the 2011 permit was a determination on the merits, even though Appellants were entitled to a contested case hearing. This gives rise to an appearance of prejudgment.

## C. UHH's and BLNR's arguments in defense of issuing the 2011 permit before the contested case hearing was held are unpersuasive

UHH and BLNR make several arguments in defense of BLNR issuing the permit before a contested case hearing. However, none of those arguments are persuasive. Rather, the circumstances of this case give rise to the reality and appearance of impropriety, and thereby violate the Due Process Clause of article I, section 5 of the Hawai'i Constitution.

UHH begins by distinguishing this case from *Kilakila 'O Haleakala v. Bd. of Land & Natural Res.*, 131 Hawai'i 193, 317 P.3d 27 (2013). UHH characterizes *Kilakila* as a case of "whether, where a formal contested case has been requested, an agency may nonetheless make a rights-determinative 'final decision' before ruling on the contested case request." UHH argues that because BLNR's 2011 decision was not "final," i.e., not "final agency action," *Kilakila* does not apply to this case. UHH also suggests that because in the instant case BLNR "simultaneously" granted a motion to hold a contested case hearing and issued the permit, this case is distinguishable from *Kilakila*, where BLNR did not make a decision on requests for a contested case hearing until its approval of the CDUA had been appealed two months later. As explained above, sequence matters. Here, BLNR issued an operative permit despite pending requests for a contested case hearing and a right to such a hearing under the applicable rules and the Hawai'i Constitution, and only then decided to hold such a hearing. This sequence— whether events were separated by two minutes or two months—plainly gives rise to the appearance of prejudgment, and denied Appellants the opportunity to be heard at a meaningful time and in a meaningful manner.

UHH next argues that because Condition 21 stayed construction on TMT, this case was unlike *Kilakila*, where BLNR approved the CDUA without staying construction. As explained above, it does not matter whether or not the permit was stayed. BLNR should not have issued the permit prior to holding a contested case hearing. Moreover, construc-

tion was stayed due to a number of conditions, and the 2011 permit authorized some aspects of TMT to commence immediately. A stay on construction did not render the 2011 permit anything less than an operative permit that was issued on the merits.

UHH next argues that Appellant Clarence Kukauakahi Ching "agreed that BLNR could properly vote and issue a permit" before a contested case hearing so long as the permit was conditioned upon construction not proceeding before a contested case hearing was resolved in favor of UHH and BLNR took a final vote also in favor of UHH. (Emphasis in original). But this statement by a private citizen at a public meeting did not authorize BLNR to act inconsistently with the Hawaiʻi Constitution, particularly with regard to the other Appellants.

Relatedly, UHH highlights Appellants' assertions that BLNR's procedural error of issuing the permit before a contested case hearing "could and should be addressed by the Hearing Officer in the contested case the BLNR ordered." (Citing Ex. A–320 to the contested case hearing, at 11, 21, 31, 42) (Emphasis omitted). UHH appears to suggest that these assertions constitute Appellants' concession that BLNR's procedural error could be remedied after-the-fact. But these statements by Appellants in letters on March 7, 2011, after BLNR had issued the permit, did not retroactively authorize BLNR to violate Appellants' due process rights under the Hawaiʻi Constitution ten days earlier.

■ UHH also argues that because Appellants made these statements and participated in the contested case hearing, Appellants "got what they requested." This argument misstates the facts. As described, multiple Appellants strenuously objected at every opportunity to BLNR issuing the permit before a contested case hearing because they believed that such sequence would not allow for adequate and impartial consideration of the merits. When BLNR did otherwise and issued the permit at the February 2011 meeting, Appellants continued to challenge that procedure with letters in March 2011, and in addition, participated in the contested case hearing on the merits and made legal arguments to the hearing officer. BLNR's February 2011 decision effectively forced Appellants to take this approach after BLNR issued the permit. Accordingly, Appellants' participation in the contested case hearing does not constitute consent to suffer the consequences of BLNR's improper decision in February 2011, or a waiver of their ability to challenge it later.

■ UHH next refers to HRS § 91–14 in support of its argument that the February 2011 decision was merely preliminary.[12] This statute concerns the scope of courts' jurisdiction for appellate review of specific types of agency rulings. UHH makes two mistaken characterizations in support of its argument: first, characterizing the 2011 permit as "preliminary" as used in this statute, and second, characterizing Appellants' position as a direct challenge of the 2011 permit. Specifically, UHH argues that if the 2011 permit was as prejudicial as Appellants contend, then it was at least a "preliminary ruling of the nature that deferral of review ... would deprive appellant of adequate relief," under HRS § 91–14, so the judicial review that Appellants seek has been waived because it was not sought "within thirty days after the preliminary ruling." *See* HRS § 91–14(a), (b).

However, UHH's reliance on this statute is flawed at the outset because UHH conflates two distinct concepts: the availability of judicial review at a particular time, and the question of whether the procedures followed by BLNR comported with due process. Es-

12. HRS § 91–14 provides, in pertinent part:

(a) Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter; . . . .

(b) Except as otherwise provided herein, proceedings for review shall be instituted in the circuit court ... within thirty days after the preliminary ruling or within thirty days after service of the certified copy of the final decision and order of the agency pursuant to rule of court. . . .

(Emphases added).

sentially, UHH attempts to utilize its substantive argument as to due process—that the 2011 permit was only tentative or "preliminary"—to make a procedural argument regarding the type of preliminary ruling for which a court has jurisdiction to review BLNR's actions. These are distinct concepts, and the way in which UHH relies on HRS § 91–14 is inapposite to the issue before this court.

UHH's argument is also flawed because Appellants are not seeking to set aside the 2011 permit, rather, they are seeking to set aside BLNR's FOFs/COLs/D&O in 2013 based on the process that led to its adoption. UHH's position would effectively require a party to a contested case hearing to appeal whenever a decisionmaker appears to engage in prejudgment of the matter at issue. Thus, for example, it would appear to require an immediate appeal where a decisionmaker makes arguably improper extrajudicial statements about the merits of a case. *See, e.g., Cinderella,* 425 F.2d at 584. Requiring a party to appeal (or lose the right to do so) based on such indefinite circumstances would encourage piecemeal appeals, inconsistent with well established law. *See Mitchell v. State Dep't of Educ.,* 77 Hawai'i 305, 308, 884 P.2d 368, 371 (1994) (stating that an end served by the requirement of a requisite degree of finality of agency decisions before appellate review is the avoidance of piecemeal litigation). Here, it was not until after the contested case hearing did not lead to adequate relief that judicial review was appropriate.

Moreover, UHH's argument is not supported by a plain reading of this statute. HRS § 91–14(b) provides that a party wishing to appeal shall appeal "within thirty days after the preliminary ruling or within thirty days after service of the certified copy of the final decision and order of the agency[.]" (Emphasis added). Accordingly, even if the 2011 permit is characterized as a "preliminary ruling" under this statute, Appellants' appeal shortly after the "final decision and order of the agency" was appropriate. Appellants did not waive a due process challenge by not immediately appealing after BLNR issued the 2011 permit.

UHH next defends the procedure here by generally arguing that it is analogous to other procedures that have been found to pass muster under due process in Hawai'i and elsewhere. However, as set forth below, UHH refers to no federal or state case—and this court finds none—similar to this case, where a decisionmaker ruled on the merits before hearing the evidence.

UHH contends that *Cinderella,* 425 F.2d 583, which prohibits appearance of the decisionmaker's "prejudgment in some measure," sets a standard that is "obsolete and generally rejected." In support, UHH refers this court to *Amerada Hess Pipeline Corp. v. Regulatory Comm'n of Alaska,* 176 P.3d 667 (Alaska 2008), for the proposition that *Cinderella* is generally rejected, and *NEC Corp. v. United States,* 151 F.3d 1361 (Fed.Cir. 1998), for the proposition that the appearance of "prejudgment in some measure" is permissible so long as the decisionmaker does not have an "irrevocably closed mind." In so arguing, UHH mischaracterizes *Cinderella*'s continued broad acceptance across the country under appropriate circumstances and ignores well established principles throughout Hawai'i case law.

In *Cinderella,* a member of the Federal Trade Commission made a public statement on a pending adjudicative matter before the Commission rendered a decision. The United States Court of Appeals for the District of Columbia held that where prejudgment is alleged, the test for disqualification is "whether a disinterested observer may conclude that (the agency) has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." 425 F.2d at 591 (internal quotation marks omitted). The court added that "an administrative hearing must be attended, not only with every element of fairness but with the very appearance of complete fairness[.]" *Id.* (internal quotation marks omitted).

Before and after *Cinderella,* the commitment to an objective "appearance of fairness" test is consistent throughout Hawai'i judicial decisions. For instance, in *Sifagaloa,* 74 Haw. 181, 840 P.2d 367, this court considered whether an employee's due process rights were violated. The employee applied for

disability retirement benefits as a member of the State Employees' Retirement System (ERS). The ERS Board of Trustees, upon reviewing a decision submitted by the Medical Board, denied Sifagaloa's request for disability retirement benefits. *Id.* at 186–87, 840 P.2d at 370. The same Board of Trustees adjudicated his appeal from the Medical Board's decision and affirmed the denial. *Id.* at 187–88, 840 P.2d at 370. On appeal, the employee asserted that he was denied due process because the Board of Trustees had conflicting interests to award retirement benefits and to preserve the retirement fund, and this conflict gave rise to an appearance of impropriety whereby the Board of Trustees' impartiality might reasonably be questioned. *Id.* at 188, 840 P.2d at 370–71.

This court observed that the Supreme Court in *Withrow* determined that the fundamentals of just procedure require impartiality of "administrative agencies which adjudicate as well as courts[,]" and concluded that there is "no reason why an administrative adjudicator should be allowed to sit with impunity in a case where the circumstances fairly give rise to an appearance of impropriety and reasonably cast suspicion on his impartiality." *Id.* at 189–90, 840 P.2d at 371 (quoting *Brown*, 70 Haw. at 467 n. 3, 776 P.2d at 1188 n. 3).

Ultimately, this court concluded that: "[f]airly read, neither the facts … nor the generalized assertions made here about [the Trustees'] 'inconsistent' responsibilities prove an interest on [their] part in the outcome of the determinations made [on Sifagaloa's claim] sufficient … to overcome the 'presumption of honesty and integrity' that attaches by virtue of [their] office." *Sifagaloa*, 74 Haw. at 193, 840 P.2d at 372 (alterations and ellipses in original). Many other Hawai'i cases take this approach. *See, e.g., In re Sawyer*, 41 Haw. 270, 283 (Haw.Terr.1956) ("A judge owes a duty not to withdraw from a case—however much his personal feelings may incline him to do so—where he is not legally disqualified, yet there may be circumstances that cast suspicion on the fairness of the judge proceeding in the case so that it may be advisable for a judge not technically disqualified to withdraw *sua sponte.*"); *Pe-*

*ters*, 48 Haw. at 262–63, 397 P.2d at 585; *Honolulu Roofing Co. v. Felix*, 49 Haw. 578, 617, 426 P.2d 298, 323 (1967) (quoting *Sawyer*); *Brown*, 70 Haw. at 462–63, 776 P.2d at 1185; *Sussel*, 71 Haw. at 106, 784 P.2d at 869 (describing *Honolulu Roofing*'s reference to *Sawyer* as "urg[ing] the circuit court to apply 'an appearance of impropriety' test in the situation at hand and disqualify the commissioners"); *State v. Ross*, 89 Hawai'i 371, 377, 974 P.2d 11, 17 (1998) (relying on *Brown); In re Estate of Damon*, 119 Hawai'i 500, 508, 199 P.3d 89, 97 (2008) (relying on, *inter alia, Sussel, Brown, Offutt, Murchison, Withrow*, and the Revised Code of Judicial Conduct in discussing the prohibition of even the appearance of impropriety).

The *Cinderella* standard also remains in use across the country. *See, e.g., Fogo De Chao (Holdings) Inc. v. United States Dep't of Homeland Sec.*, 769 F.3d 1127, 1149 (D.C.Cir.2014); *McClure v. Indep. Sch. Dist. No. 16*, 228 F.3d 1205, 1216 n. 8 (10th Cir. 2000); *Stivers v. Pierce*, 71 F.3d 732, 741, 747 (9th Cir.1995).

Nevertheless, UHH refers this court to *Amerada*, where the Alaska Supreme Court explained its view that the *Cinderella* standard "most squarely stands"—notably in the present tense—"for the proposition that intemperate public remarks by a decisionmaker create a constitutionally impermissible appearance of outcome-determinative prejudgment." *Amerada*, 176 P.3d at 674, 676. It characterized *Cinderella* as a "public-foot-in-mouth case," and noted that "public intemperance [was] so central" to the decision that, it "can best be viewed as [a] response[ ] to egregious official obnoxiousness which gratuitously undermines public trust." *Id.* at 674, 676. According to *Amerada*, *Cinderella* did not set an "across-the-board standard[ ] for all agency prejudgments of arguably adjudicative facts." *Id.* at 676. *Amerada* involved allegations that a commission's decision concerning the Trans Alaska Pipeline was tainted because one of the commission's staff persons previously wrote a master's thesis regarding that pipeline system. *Id.* at 672. The *Amerada* court was critical of the *Cinderella* test, calling it vague, "unduly abstract and impracti-

cal," and inconsistent with a presumption of regulatory propriety, and referred to federal cases in support of its critique. *Id.* at 675–76. Ultimately, though, the *Amerada* court applied the *Cinderella* standard in evaluating the due process claim under the United States Constitution: "This situation does not approach that zone of egregiousness where federal courts discern a procedural due process violation based on prejudgment bias relegating adjudication to 'predestined grooves.'" *Id.* at 676 (quoting *Cinderella,* 425 F.2d at 590).

Although the Alaska Supreme Court and some other jurisdictions have been critical of *Cinderella,* Hawai'i courts continue to embrace the dual requirements of the reality and the appearance of justice. Accordingly, UHH's argument that the *Cinderella* standard is generally rejected is both incorrect and inconsistent with Hawai'i case law. *See, e.g., Sawyer,* 41 Haw. at 270; *Honolulu Roofing,* 49 Haw. at 617, 426 P.2d at 323; *Sussel,* 71 Haw. at 106, 784 P.2d at 869; *Sifagaloa,* 74 Haw. at 191, 840 P.2d at 372.

UHH next argues that rehearing of a matter by the same tribunal is a regular occurrence and does not violate due process. (Citing *FTC v. Cement Inst.,* 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948)). In *Cement Institute,* a party alleged, one year after testimony had been concluded but "while ... proceedings were still pending," prejudgment by members of the Federal Trade Commission who investigated the parties, submitted reports on the matters at issue to Congress and the President in accordance with law, testified before congressional committees in hearings related to their reports, and whose reports and testimonies indicated their opinions that were shaped while preparing the reports. *Id.* at 700, 68 S.Ct. 793. The Court concluded that the commission was not necessarily disqualified from the matter before it because (1) the party could still present evidence and argument before the Commission rendered its decision, *id.* at 701, 68 S.Ct. 793, (2) "the fact that the Commission had entertained such views as the result of its prior ex parte investigations did not necessarily mean that the minds of its members were irrevocably closed on the [issues]," *id.* at 701, 68 S.Ct.

793, (3) congressional purposes would be frustrated if commission members could not have testified or reported, *id.* at 701–02, 68 S.Ct. 793, and (4) "judges frequently try the same case more than once and decide identical issues each time[,]" *id.* at 703, 68 S.Ct. 793.

*Cement Institute* is different from this case. Unlike the party in *Cement Institute,* Appellants were not afforded an opportunity to present evidence before BLNR rendered its decision on the merits. As discussed, an "irrevocably closed" mind is not the applicable standard under Hawai'i law. Rather, Hawai'i law is consistent with the *Cinderella* standard. Unlike *Cement Institute,* no act of Congress, statute, or even administrative rule would have been frustrated by BLNR holding a contested case hearing before deciding whether to issue the permit.

UHH refers to *Cement Institute* apparently in support of the notion that BLNR could "vote again" on the application after voting on it in 2011. But *Cement Institute* does not provide any guidance on the issue of whether BLNR's issuance of the permit before a contested case hearing gave rise to the appearance of impropriety.

UHH next refers to *Nat'l Labor Relations Bd. v. Donnelly Garment Co.,* 330 U.S. 219, 67 S.Ct. 756, 91 L.Ed. 854 (1947), for the proposition that an administrative decisionmaker should not be excluded for prejudgment from rehearing a case merely because the decisionmaker previously excluded evidence that was later found to have been erroneously excluded. UHH also refers to *Morgan v. Planning Dep't, Cnty. of Kauai,* 104 Hawai'i 173, 86 P.3d 982 (2004), for the related proposition that agencies have "inherent authority to reconsider [their] own decisions." (Quoting *id.* at 185, 86 P.3d at 994). But the issue here is not BLNR rehearing or reconsidering anything.

UHH next refers to *MacKay v. McAlexander,* 268 F.2d 35 (9th Cir.1959), and *Pangburn v. Civil Aeronautics Bd.,* 311 F.2d 349 (1st Cir.1962), for the propositions that an agency administrator who presides over a proceeding similar to and related to a prior proceeding, or who has had contact in a prior hearing with facts at issue in the hearing at

bar, or who has taken a public position on facts, does not inherently violate due process under the United States Constitution. Simply put, those propositions refer to different factual circumstances and do not guide disposition of this case. The due process issue under the Hawaiʻi Constitution here concerns the propriety of BLNR issuing the permit at the outset in 2011, not what it did afterward.

In sum, although UHH defends the procedure here by generally arguing that it is analogous to other procedures that have been found to pass muster, no case put forth by UHH is analogous to the circumstances here.

■ UHH also defends the position that the hearing officer and BLNR adopted in response to Appellants' argument that the sequence of issuing the permit before a contested case hearing was improper. The hearing officer and BLNR, in their respective findings, conclusions, and orders in 2012 and 2013 stated that this sequence was authorized by HAR § 13–1–28(b) (2009). This rule provides: "The contested case hearing shall be held after any public hearing which by law is required to be held on the same subject matter." HAR § 13–1–28(b). Here, the contested case hearing was indeed held after public hearings. Critically, however, and contrary to Lemmo's response to BLNR member Pacheco's question on the issue, this rule did not authorize BLNR to decide the merits and issue the permit before the contested case hearing, or before the request for a contested case hearing had been resolved. In any event, due process would prohibit such a procedure.

■ It might be argued that the high level of detail over 126 pages of BLNR's FOFs/COLs/D&O demonstrates transparency that mitigates, albeit belatedly, an appearance of prejudgment. Indeed, one benefit of a transparent articulation of the bases for decisions is the impression that the "processes were in fact meaningful to the outcome." Redish & Marshall, *Adjudicatory Indepen-*

*dence*, 95 Yale L.J. at 486 (internal quotation omitted, emphasis omitted).

That said, the similarity between the 2011 permit and the 2013 decision give the exact opposite impression, because this similarity exists despite what BLNR received in between: thousands of pages of written testimonies, exhibits, and factual and legal arguments, and dozens of hours of verbal testimonies and more legal arguments. As a result, the virtually indistinguishable documents of 2011 and 2013 give the impression that none of the testimonies, arguments, or evidence submitted to BLNR between the two were seriously considered. BLNR should not have issued the permit before the request for a contested case hearing had been resolved. The appearance of prejudgment continues.

■ UHH next argues that the remedy Appellants seek—remand to a new hearing officer for a new contested case hearing—reveals a flaw in Appellants' position. Specifically, UHH contends that even if a new hearing officer holds a new contested case hearing, the matter would again be presented to BLNR for a final vote, as it was in 2013, and thus would not resolve Appellants' challenge to BLNR's prejudgment. This argument is mistaken because Appellants do not challenge BLNR's ability to be fair and impartial (i.e., Appellants are not seeking recusal of any or all members of BLNR). Rather, Appellants contend and this court agrees that BLNR erred in the way it proceeded in 2011, which is not necessarily indicative of how it may proceed upon remand with a clean slate.[13]

■ BLNR argues that when it approved the CDUA and issued the CDUP at the February 25, 2011 meeting, a request for a contested case hearing was not perfected, so BLNR did not ignore a procedurally-compliant request. In support, BLNR refers to HAR § 13–1–29 (2009), which generally states that in addition to a request for a contested case hearing before the close of a

**13.** Moreover, this court takes judicial notice that none of the members of BLNR who voted on February 25, 2011 are currently members of BLNR. *See* Hawaiʻi Rules of Evidence Rule 201 (regarding judicial notice); *Compare* http://dlnr. hawaii.gov/boards-commissions/blnr/ (listing BLNR members as of October 20, 2015), *with* ROA 15, ICA Dkt. 60:4 (listing BLNR members who voted on February 25, 2011).

board meeting, a written petition must also be filed soon after the board meeting.

BLNR generally reads this rule correctly, but the absence of a perfected request for a contested case hearing did not authorize BLNR to issue a permit before such contested case hearing might be granted or occur. This is particularly so because there was no doubt that a contested case hearing would in fact be held, given (1) that Appellants were entitled to a contested case hearing under the applicable administrative rules and the Hawaiʻi Constitution; (2) numerous requests for a contested case hearing as early as the public hearings in December 2010 and leading up to the February 25, 2011 meeting; (3) repeated requests during the February 25, 2011 meeting for a contested case hearing and specific requests to not issue a permit before such hearing; (4) Lemmo's apparent conclusion and recommendation that a contested case hearing should be held; and (5) BLNR's apparent agreement with Lemmo by deciding on its own motion that a contested case hearing should be held.

BLNR also argues that Appellants have not overcome the presumption that administrative adjudicators perform their duties with honesty and integrity.[14] *See Withrow*, 421 U.S. at 47, 95 S.Ct. 1456. Under the factual circumstances of this case as described above—most notably, the appearance of impropriety created by the process employed by BLNR—this presumption does not warrant judgment in favor of BLNR. *See Murchison*, 349 U.S. at 136, 75 S.Ct. 623 (stating that the requirement that proceedings must appear fair "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties").

In short, BLNR acted improperly when it issued the permit prior to holding a contested case hearing. No case or argument put forth by UHH or BLNR persuades otherwise.

14. BLNR also refers this court to cases which generally state that due process does not require absolute "perfect[]" execution of procedural

## IV. CONCLUSION

For the foregoing reasons, this court vacates the circuit court's May 5, 2014 Decision and Order Affirming Board of Land and Natural Resources, State of Hawaiʻi's Findings of Fact, Conclusions of Law and Decision and Order Granting Conservation District Use Permit for the Thirty Meter Telescope at the Mauna Kea Science Reserve Dated April 12, 2013, and final judgment thereon. This matter is remanded to the circuit court to further remand to BLNR for proceedings consistent with this opinion, so that a contested case hearing can be conducted before the Board or a new hearing officer, or for other proceedings consistent with this opinion.

Concurring Opinion by POLLACK, J., in which WILSON, J., joins, and in which McKENNA, J., joins as to Part IV.

Rising to a majestic 13,796 feet above sea level, Mauna Kea, the highest mountain peak in the Hawaiian Islands, is of profound importance in Hawaiian culture. The summit region is sacred to Native Hawaiians, and because of its spiritual qualities, traditional and customary cultural practices are exercised throughout the summit area.

Mauna Kea is also one of the world's foremost locations for astronomical observation and research. The Board of Land and Natural Resources (Board) issued the University of Hawaiʻi at Hilo (UH) a permit to construct a 180-foot high astronomical observatory within a conservation district on Mauna Kea over the objections of Native Hawaiians and others, who sought a contested case hearing to fully assess the effects of the project prior to making a decision of whether to issue the permit. Instead, the Board approved the permit but included a condition that, if a contested case proceeding was initiated, then construction could not commence until the Board conducted such a hearing.

The Board's procedure of holding a contested case hearing after the permit has already been issued does not comply with our case law, *see Kilakila ʻO Haleakala v. Bd. of*

protections, and although this is true, this general statement does not warrant judgment in favor of BLNR under the circumstances of this case.

400

*Land & Nat. Res.*, 131 Hawai'i 193, 205–06, 317 P.3d 27, 39–40 (2013) (concluding that a contested case hearing was required "prior to decision making on UH's application"), nor with Hawai'i Revised Statutes (HRS) § 91–1 (2012) (defining "contested case" to mean "a proceeding in which legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing"), nor with due process under the Hawai'i Constitution (lack of meaningful opportunity to be heard compromised appearance of justice). I therefore concur in the majority's result. However, I write separately because this court's precedents have established that, in addition to these grounds, other provisions and guarantees of the Hawai'i Constitution forge the right to a contested case hearing and establish procedures essential to safeguard the rights protected by the constitution in cases such as this one.

### I. Traditional Hawaiian Rights Under Article XII, Section 7

Our proud legal tradition in this State of protecting Native Hawaiian rights is not of recent vintage, for even as far back as the days of the Hawaiian Kingdom, protections have been in place to ensure the continued exercise of traditional Hawaiian rights amidst the pressures exerted by countervailing interests of a changing society. *See Pub. Access Shoreline Haw. v. Haw. Cty. Planning Comm'n (PASH )*, 79 Hawai'i 425, 437 n. 21, 903 P.2d 1246, 1258 n. 21 (1995) (discussing laws dating back to the era of the Hawaiian Kingdom with provisions that ensured protection of Native Hawaiian customs and traditions).

In 1978, protection of traditional and customary Hawaiian rights was preserved within the Hawai'i Constitution. Article XII, Section 7 embodies the resolute promise by the State to "protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a [1] tenants who are descendants

of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right ... to regulate such rights." Haw. Const. art. XII, § 7; *see In re 'Iao Ground Water Mgmt. Area High–Level Source Water Use Permit Applications ('Iao )*, 128 Hawai'i 228, 247, 287 P.3d 129, 148 (2012). So robust is this promise that even though Article XII, Section 7 carves out for the State the power to regulate the exercise of customary and traditional Hawaiian rights, this court underscored that "the State is obligated to protect the reasonable exercise of customarily and traditionally exercised rights of Hawaiians to the extent feasible." *PASH*, 79 Hawai'i at 450 n. 43, 903 P.2d at 1271 n. 43.

The meaning of Article XII, Section 7 was first examined by this court in *Kalipi v. Hawaiian Trust Co.*, 66 Haw. 1, 656 P.2d 745 (1982). In that case, the plaintiff sought "to exercise traditional Hawaiian gathering rights" on undeveloped lands within an ahupua'a on the island of Moloka'i. *Id.* at 3, 656 P.2d at 747. The plaintiff "assert[ed] that it ha[d] long been the practice of him and his family to travel the lands of the [d]efendants in order to gather indigenous agricultural products for use in accordance with traditional Hawaiian practices." *Id.* at 3–4, 656 P.2d at 747. Chief Justice Richardson, writing for the court, stated that "any argument for the extinguishing of traditional rights based simply upon the possible inconsistency of purported native rights with our modern system of land tenure must fail," for the exercise of these traditional rights are protected pursuant to the express terms of the Hawai'i Constitution. *Id.* at 4, 656 P.2d at 748. The *Kalipi* court held that "lawful occupants of an ahupua'a may, for the purposes of practicing native Hawaiian customs and traditions, enter undeveloped lands within the ahupua'a to gather those items enumerated in the statute." [2] *Id.* at 7–8, 656 P.2d at 749.

Ten years later, this court extended *Kalipi* 's holding in *Pele Defense Fund v. Paty*, 73 Haw. 578, 837 P.2d 1247 (1992). There,

---

1. An ahupua'a refers to a division of land that generally runs from the sea to the mountains. *Palama v. Sheehan*, 50 Haw. 298, 300, 440 P.2d 95, 97 (1968).

2. For purposes of uniformity, Hawaiian words in quoted passages that do not include the 'okina or kahakō, e.g., "ahupuaa" instead of "ahupua'a," have been modified, without showing the modification in brackets.

the plaintiff maintained that its "native Hawaiian members were entitled under Article XII, § 7 to enter Wao Kele 'O Puna and the Puna Forest Reserve to exercise traditional and customary rights" since they were tenants who resided in the ahupua'a abutting Wao Kele 'O Puna. *Id.* at 616, 837 P.2d at 1269. This court disavowed any notion that traditional Hawaiian gathering rights may only be exercised within an ahupua'a and by the lawful occupants of the ahupua'a. *Id.* at 620–21, 837 P.2d at 1272. The *Paty* court reasoned that traditional Native Hawaiian gathering rights are not grounded only in land ownership but also in the practiced customs of Native Hawaiians. *Id.* And if those practiced customs indicate that traditional gathering was conducted in an area outside of, but abutting, an ahupua'a, then undeveloped portions of that area may be accessed by individuals of native Hawaiian descent for traditional gathering purposes. *Id.*

In *PASH*, this court interpreted *Kalipi's* discussion of customary rights derived from the Hawaiian usage exception in HRS § 1–1 (2009) [3] and affirmed that "the <u>reasonable</u> exercise of ancient Hawaiian usage is entitled to protection under article XII, section 7." 79 Hawai'i at 442, 903 P.2d at 1263. Further, the court declared that the regulatory power reserved for the State in Article XII, Section 7 does not equate to the authority to extinguish traditional and customary Hawaiian rights because they have become "inconsistent with generally understood elements of the western doctrine of 'property.'" *Id.*

Article XII, Section 7 was pronounced by this court in *Ka Pa'akai O Ka'Aina v. Land Use Commission*, 94 Hawai'i 31, 7 P.3d 1068 (2000), as placing "an <u>affirmative duty</u> on the State and its agencies to preserve and protect traditional and customary native Hawaiian rights." *Id.* at 45, 7 P.3d at 1082 (emphasis added). At the core of this affirmative duty, as explained by the *Ka Pa'akai* court, is the responsibility of the State and its constituent agencies to act only after "inde-

pendently considering the effect of their actions on Hawaiian traditions and practices." *Id.* at 46, 7 P.3d at 1083.

The court also held that meaningful protection of Native Hawaiian rights pursuant to Article XII, Section 7 means that they must be enforceable through "an analytical framework [that] endeavor[s] to accommodate the competing interests of protecting native Hawaiian culture and rights, on the one hand, and economic development and security, on the other." *Id.* The analytical framework crafted by the court required the State and its agencies "at a minimum" to make particularized findings and conclusions regarding the identity and scope of " 'valued cultural, historical, or natural resources' in the petition area," including

(1) ... the extent to which traditional and customary native Hawaiian rights are exercised in the petition area;

(2) the extent to which those resources—including traditional and customary native Hawaiian rights—will be affected or impaired by the proposed action; and

(3) the feasible action, if any, to be taken by the [agency] to reasonably protect native Hawaiian rights if they are found to exist.

*Id.* at 47, 7 P.3d at 1084 (format altered).

Because the Land Use Commission in *Ka Pa'akai* did not render sufficient findings and conclusions addressing these essential considerations before reclassifying land in a conservation district to an urban district, this court was not able to determine whether the agency "discharged its duty to protect customary and traditional practices of native Hawaiians to the extent feasible." *Id.* at 48, 7 P.3d at 1085. Thus, we concluded that the Land Use Commission "failed to satisfy its ... constitutional obligations." *Id.* at 52, 7 P.3d at 1089.

The *Ka Pa'akai* framework was later applied in the context of an agency's amend-

---

**3.** HRS § 1–1, in relevant part, provides as follows:

The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii in all cases, <u>except as</u> otherwise expressly provid-

ed by the Constitution or laws of the United States, or by the laws of the State, or <u>fixed by Hawaiian judicial precedent, or established by Hawaiian usage</u>....
(Emphases added).

ment of an interim instream flow standards (IIFS) for certain streams on the island of Maui. *'Iao*, 128 Hawai'i at 247–48, 287 P.3d at 148–49. This court in *'Iao* determined that the agency failed to comply with the framework because, although the agency recognized that the amendment would limit "the native Hawaiian practices of kalo cultivation and gathering," it did not make "findings or conclusions articulating the effect of the amended IIFS on the native Hawaiian practices" and the feasibility of protecting those practices. *Id.* at 248–49, 287 P.3d at 149–50.

Thus, this court's evolving jurisprudence concerning Native Hawaiian traditional and customary rights has conceived of a system in which the State and its agencies bear an affirmative constitutional obligation to engage in a meaningful and heightened inquiry into the interrelationship between the area involved, the Native Hawaiian practices exercised in that area, the effect of a proposed action on those practices, and feasible measures that can be implemented to safeguard the vitality of those practices. *See id.* at 247–48, 287 P.3d at 148–49; *Ka Pa'akai*, 94 Hawai'i at 47, 7 P.3d at 1084. When an individual of Native Hawaiian descent asserts that a traditionally exercised cultural, religious, or gathering practice in an undeveloped or not fully developed area would be curtailed by the proposed project, the State or the applicable agency is "obligated to address" this adverse impact in its findings and conclusions pursuant to the *Ka Pa'akai* framework. *Ka Pa'akai*, 94 Hawai'i at 46, 50, 7 P.3d at 1083, 1087.

Consequently, if customary and traditional Native Hawaiian practices are to be meaningfully safeguarded, "findings on the extent of their exercise, their impairment, and the feasibility of their protection" are paramount. *Ka Pa'akai*, 94 Hawai'i at 50, 7 P.3d at 1087. To effectively render such findings, it is imperative for the agency to receive evidence and then make "[a] determination ... supported by the evidence in the record." *In re Haw. Elec. Light Co.*, 60 Haw. 625, 642, 594 P.2d 612, 623 (1979) (findings of basic facts "are required to be supported by the evidence in the record"); *Finding of Fact*, Black's Law Dictionary (10th ed. 2014). Thus, the agency must act as a factfinder—to evaluate the evidence presented by the parties—in order to determine whether the exercise of Native Hawaiian rights will be limited to some extent. To fulfill this duty and to permit such findings to be made, the agency is obligated to conduct a contested case hearing before the legal rights of the parties are decided.[4]

In this case, several individuals testified during the public hearings about the sanctity of Mauna Kea to Native Hawaiian culture.[5] Prior to the vote granting the permit, the Administrator of the Office of Conservation and Coastal Lands provided the Board with a background relating to UH's application for the permit. His comments also informed the Board of the project's potential for significant impacts on the exercise of Hawaiian cultural practices:

> Number one we acknowledge and discussed the importance of the ancient and

---

4. *See Kilakila 'O Haleakala*, 131 Hawai'i at 209, 317 P.3d at 43 (Acoba, J., concurring) (reasoning that the appellants' assertion—that their traditional and customary practices would be adversely affected by the agency's action—triggered their right to a contested case hearing); *'Iao*, 128 Hawai'i at 271, 287 P.3d at 172 (Acoba, J., concurring) ("[W]here native Hawaiian Petitioners claim that their native Hawaiian rights are adversely affected by the [Land Use Commission's] decision ... they may sue to enforce their rights under Article XII, Section 7 of the Hawai'i Constitution."); *Kaleikini v. Thielen*, 124 Hawai'i 1, 31, 237 P.3d 1067, 1097 (2010) (Acoba, J., concurring) ("[N]ative Hawaiians ... have equal rights to a contested case hearing where these [traditional and customary] practices are adversely affected.").

5. An example of the concerns raised can be found in a letter, which was submitted to the Board during the course of the public hearings, from petitioner Mauna Kea Anaina Hou, The Royal Order of Kamehameha, Sierra Club, and petitioner Clarence Kukauakahi Ching. The letter emphasized that "Mauna Kea is considered the Temple of the Supreme Being[,] the home of Na Akua (the Divine Deities), Na 'Aumakua (the Divine Ancestors), and the meeting place of Papa (Earth Mother) and Wakea (sky Father)." Additionally, the letter stated that "[t]he ceremonies and practices on Mauna Kea are practiced nowhere else[ ] and formed the basis of the navigational knowledge that allowed Hawaiians to navigate over ten million square miles of the Pacific."

contemporary cultural values and resources at Mauna Kea....

[W]e acknowledge concerns remain regarding the project[']s impact on the spiritual nature of Mauna Kea and on the cultural beliefs and practices of many—that is clear. Interpretation of the spiritual impact is based upon individual perception. For some no mitigation is possible and any development on the mountain would be sacrilegious....

At the end of the day what it comes down to is these values were identified—the worshipping, the placement of piko, the gathering of water, gathering of stones and burials were all identified. The [e]ffects of the project on these things were considered. What flowed from that is the third part of the *Ka Pa'akai* analysis which is how do we mitigate the effect of the project on these values....

(Emphasis added). Thus, the Board was informed of multiple traditional Hawaiian cultural practices exercised in the project area and was aware of the project's potential adverse impact on the "spiritual nature of Mauna Kea" and the "cultural beliefs and practices of many."

Nonetheless, despite numerous requests for a contested case hearing, the Board proceeded to summarily approve the permit in contravention of its obligation to determine the extent of the impairment of Native Hawaiian cultural practices that would be caused by the proposed action and the feasibility of protecting such practices. The Board's action was in clear derogation of its "affirmative duty" to fully and carefully assess evidence presented in a hearing, which is critical to making essential findings and conclusions pursuant to the *Ka Pa'akai* framework. "The promise of preserving and protecting customary and traditional rights would be illusory absent findings on the extent of their exercise, their impairment, and the feasibility of their protection." *Ka Pa'akai*, 94 Hawai'i at 50, 7 P.3d at 1087. Thus, the Board was required to conduct a heightened inquiry evaluating the requisite factors in a contested case hearing before reaching a determination on the permit application. Such a hearing would have enabled

the Board to make the findings and conclusions that are essential to the Board's determination of whether or not to grant the permit. Because such a heightened inquiry was not conducted, the Board had no basis for its decision, and "as a matter of law," the Board "failed to satisfy its ... constitutional obligations" under Article XII, Section 7 of the Hawai'i Constitution. *Id.* at 52, 7 P.3d at 1089.

## II. The Public Trust Doctrine Under Article XI, Section 1

### A.

The public trust doctrine is an ancient principle recognizing that certain resources bestowed by nature are so inviolable that their benefits should accrue to the collective, rather than only to certain members of society. *See Martin v. Waddell's Lessee*, 41 U.S. 367, 414, 16 Pet. 367, 10 L.Ed. 997 (1842) (opining that navigable waters and lands under them are not susceptible to private ownership); J. Inst. 2.1.1 (under Roman law, "the following things are by natural law common all—the air, running water, the sea, and consequently the sea-shore"); 2 H. Bracton, *De Legibus et Consuetudinibus Angliae* 40 (S. Thorne transl. 1968) (thirteenth-century English common law stated that "[a]ll rivers and ports are public, so that the right to fish therein is common to all persons. The use of river banks, as of the river itself, is also public"). The values vindicated by this doctrine are so universal in their application that, in this jurisdiction, its roots can be traced to the time of the Hawaiian Kingdom, when it was reaffirmed that it was not the King—the sovereign—but "the people of Hawai'i [who] are the original owners of all Hawaiian land." *State v. Zimring*, 58 Haw. 106, 111, 566 P.2d 725, 729 (1977).

The Constitution of 1840, the first one to bind Hawai'i, expressly provided that "all the land from one end of the Islands to the other" belonged to Kamehameha I, "though it was not his own private property[, for i]t belonged to the chiefs and the people in common, of whom Kamehameha I, was the head." Fundamental Law of Hawaii 3 (Lorrin A. Thurston ed., 1904). Hence, lands held in the public domain—those that the

populace owned at large—constituted all lands in Hawai'i, and the King "owned" them only for the purpose of benefiting everyone within his Kingdom. This arrangement was changed after the Great Māhele, "a process with multiple divisions or allocations of land," *Native Hawaiian Law: A Treatise* 13 (Melody Kapilialoha MacKenzie et al. eds., 2015), which ushered in an era where private ownership of Hawaiian lands was allowed. *See Zimring*, 58 Haw. at 112–13, 566 P.2d at 730–31 (discussing how the King signed instruments transferring ownership of royal lands to the Hawaiian government, the chiefs and konohiki,[6] and the people at large, while retaining for himself and his heirs some designated lands).

After the effectuation of the Great Māhele, all lands that were not claimed for private ownership remained in the public domain, subject to the stewardship of the government for the benefit of the people. *See id.* at 114, 566 P.2d at 731 ("[L]and in its original state is public land and if not awarded or granted, such land remains in the public domain."). Following the overthrow of the monarchy, the Crown Lands were also added to the public domain. *Id.* at 113, 566 P.2d at 731.

The nature of the public trust in the modern era was expounded upon by this court in *Zimring*. In that case, lava flows from the 1955 Puna volcanic eruption on the island of Hawai'i resulted in the addition of "approximately 7.9 acres of new land" to the shoreline. *Id.* at 107, 566 P.2d at 727. These lava extensions were adjacent to private land owned by the defendants. *Id.* at 107, 566 P.2d at 727–28. The defendants entered the lava extensions and made improvements upon them, at which point the State demanded that they vacate the lava extensions and cease and desist from engaging in any other activities thereon. *Id.* at 108, 566 P.2d at 728. Thereafter, the State sued the defendants and their predecessors-in-interest to quiet title, and the case was later appealed. *Id.* at 108–10, 566 P.2d at 728–29.

Chief Justice Richardson concluded for the court that the people of Hawai'i are the beneficial owners of public lands. *Id.* at 125, 566 P.2d at 737. This fundamental principle was acknowledged in the Admission Act, which "provided that the public lands conveyed to the State upon admission 'shall be held by said State as a public trust for the support of public schools and other public institutions, for the betterment of the conditions of native Hawaiians ..., for making of public improvements, and for the provisions of lands for public use.'" *Id.* (quoting Admission Act, Pub. L. No. 86–3, 73 Stat. 5 (1959)). The *Zimring* court held that "the equitable ownership of the [lava extensions] and other public land in Hawai'i has always been in its people. Upon admission, trusteeship to such lands was transferred to the State, and the subject land has remained in public trust since that time." *Id.* (emphases added). The court was clear, however, that the trusteeship that the State assumed was coupled with the associated obligation "to protect and maintain the trust property and regulate its use." *Id.* at 121, 566 P.2d at 735.

Shortly after *Zimring*, the concept of public trust was reaffirmed by the framers of the 1978 Constitution:

> For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.
>
> All public natural resources are held in trust by the State for the benefit of the people.

Haw. Const. art. XI, § 1 (emphases added).

This court has never precisely demarcated the dimensions of the public trust doctrine as incorporated in Article XI, Section 1. Nonetheless, through case-by-case adjudication, this court has carefully applied the fundamental principles inherent in the concept of public trust and, in the process, has ad-

6. "Konohiki in ancient Hawai'i were agents of the King or chiefs." *Zimring*, 58 Haw. at 112 n. 4, 566 P.2d at 730 n. 4.

dressed attendant duties that the State and its agencies must discharge in instances where it applies.

In the context of water resources, this court in *In re Water Use Permit Applications (Waiahole I )*, 94 Hawai'i 97, 9 P.3d 409 (2000), determined that "[t]he plain reading of" Article XI, Section 1 "manifests the framers' intent to incorporate the notion of the public trust into our constitution." *Id.* at 131, 9 P.3d at 443. Hence, we held "that article XI, section 1 . . . adopt[s] the public trust doctrine as a fundamental principle of constitutional law in Hawai'i." *Id.* at 132, 9 P.3d at 444. Defining the substance of the public trust, the court stated that it "is a dual concept of sovereign right and responsibility." *Id.* at 135, 9 P.3d at 447. As a logical extension of this duality, the court concluded, based on the express language of Article XI, Section 1, that the public trust represents the twin "mandate of 1) protection and 2) maximum reasonable and beneficial use." *Id.* at 139, 9 P.3d at 451.

Applied to water resources, the court found that "the [S]tate has both the authority and duty to preserve the rights of present and future generations in the waters of the [S]tate." *Id.* at 141, 9 P.3d at 453. This means that the State and its agencies may not grant or assert "vested rights to use water to the detriment of public trust purposes." *Id.* Therefore, in planning and allocating various water resources, the State "bears an 'affirmative duty to take the public trust into account.' " *Id.* (quoting *Nat'l Audubon Soc'y v. Super. Ct.*, 33 Cal.3d 419, 189 Cal.Rptr. 346, 658 P.2d 709, 728 (1983)).

*Waiahole I* was an explicit acknowledgement by this court that the public trust doctrine, as incorporated into the Hawai'i Constitution, necessitates "a balancing process" between the constitutional requirements of protection and conservation of public trust resources, on the one hand, and the development and utilization of those resources, on the other. *Id.* at 142, 9 P.3d at 454. This balancing process, however, exists in a framework demanding that "any balancing between public and private purposes [must] begin with a presumption in favor of public use, access, and enjoyment." *Id.* The burden

of showing that the requisite balance has been properly evaluated "in light of the purposes protected by the trust" rests on "those seeking or approving such uses." *Id.*

Because of the constitutional stature of the State's duties under the public trust doctrine, the *Waiahole I* court described the following standard by which the State's actions concerning public trust resources are reviewed on appeal:

> "The duties imposed upon the state are the duties of a trustee and not simply the duties of a good business manager." Just as private trustees are judicially accountable to their beneficiaries for dispositions of the res, so the legislative and executive branches are judicially accountable for the dispositions of the public trust. The beneficiaries of the public trust are not just present generations but those to come. The check and balance of judicial review provides a level of protection against improvident dissipation of an irreplaceable res.

*Id.* at 143, 9 P.3d at 455 (emphases added) (citation omitted) (quoting *Ariz. Ctr. for Law in Pub. Interest v. Hassell*, 172 Ariz. 356, 837 P.2d 158, 168–69 (Ariz.Ct.App.1991)).

The compelling duty of the State is "to consider the cumulative impact of existing and proposed diversions on trust purposes[,] to implement reasonable measures to mitigate this impact, including the use of alternative sources," and to plan and make decisions "from a global, long-term perspective." *Id.* Distilled to its essence, "the [S]tate may compromise public rights in the resource pursuant only to a decision made with a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state." *Id.*

This court, in *In re Wai'ola O Moloka'i, Inc.*, 103 Hawai'i 401, 83 P.3d 664 (2004), held that the State has a continuing trust obligation to "ensure the continued availability and existence of its water resources for present and future generations." *Id.* at 431, 83 P.3d at 694 (quoting *Waiahole I*, 94 Hawai'i at 139, 9 P.3d at 451). That case involved, inter alia, whether a State agency's grant of a water use permit was proper in light of

another State agency's water reservation. *Id.* The court determined that the agency's failure "to render the requisite [findings of fact] and [conclusions of law] with respect to whether [the permit applicant] had satisfied its burden as mandated by the [State Water] Code" was tantamount to a violation of the agency's "public trust duty to protect" the reservation of water rights at issue. *Id.* at 432, 83 P.3d at 695.

The *Wai'ola O Moloka'i* court also interlinked two constitutionally based legal principles: the public trust doctrine and the right to exercise Native Hawaiian customs and traditions. According to the court, the applicant was required to prove that "the proposed water use would not abridge or deny traditional and customary native Hawaiian rights."[7] *Id.* at 442, 83 P.3d at 705. Because the agency excluded evidence as to the adverse effect of the proposed water use on the traditional and customary Native Hawaiian gathering rights, the court held that the agency failed to "effectively balanc[e] [the] proposed private commercial use of water against an enumerated public trust purpose, namely the protection of native Hawaiians' traditional and customary gathering rights, as mandated by article XII, section 7 of the Hawai'i Constitution."[8] *Id.* at 443, 83 P.3d at 706 (emphasis added).

In *Kelly v. 1250 Oceanside Partners*, 111 Hawai'i 205, 140 P.3d 985 (2006), this court again expounded upon the duties inherent in the public trust doctrine. There, we held that the duties under the public trust doctrine bind not only the State and its agencies

but also the several counties of this State. *See id.* at 224, 140 P.3d at 1004. Pursuant to the agency's duty as a public trustee, and as "guardian of the water quality in this [S]tate," the agency "must not relegate itself to the role of a 'mere umpire' ... but instead must take the initiative in considering, protecting, and advancing public rights in the resource at every stage of the planning and decision-making process." *Id.* at 231, 140 P.3d at 1011 (alteration in original) (quoting *Waiahole I*, 94 Hawai'i at 143, 9 P.3d at 456).[9]

In *In re 'Iao Ground Water Mgmt. Area High–Level Source Water Use Permit Applications ('Iao )*, 128 Hawai'i 228, 287 P.3d 129 (2012), this court found that, in instances where an agency lacks data or information to discharge its duties pursuant to the public trust doctrine, the agency "must 'take the initiative' to obtain the information it needs. Where the [agency]'s decisionmaking does not display 'a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state,' the decision cannot stand." *Id.* at 262, 287 P.3d at 163 (quoting *Wai'ola O Moloka'i*, 103 Hawai'i at 422, 83 P.3d at 685).

Recently, this court reiterated the independent nature of the duties pursuant to the public trust doctrine in *Kauai Springs, Inc. v. Planning Commission of Kaua'i*, 133 Hawai'i 141, 324 P.3d 951 (2014). In that case, we observed that, "[a]s the public trust arises out of a constitutional mandate, the duty and authority of the [S]tate and its subdivisions

---

7. The *Waiahole I* court also, consistent with Hawaii's legal history, prior precedent, and the constitutional mandate, "continue[d] to uphold the exercise of Native Hawaiian and traditional and customary rights as a public trust purpose." *Waiahole I*, 94 Hawai'i at 137, 9 P.3d at 449 (citations omitted).

8. The court clarified, in *In re Contested Case Hearing on Water Use Permit Application Filed by Kukui (Molokai), Inc.*, 116 Hawai'i 481, 174 P.3d 320 (2007), that in cases where Native Hawaiian rights figure in an agency's public trust balancing, the burden is not on parties of Native Hawaiian ancestry to prove that the proposed use would harm traditional and customary Native Hawaiian rights; rather, the permit applicants and the agency are the parties obligated to justify the proposed use and the approval thereof in

light of the trust purpose of protecting Native Hawaiian rights. *Id.* at 507–09, 174 P.3d at 346–48.

9. The duty of the agency does not cease after it has engaged in the required balancing of competing interests in the course of evaluating whether a water use permit should issue and in determining whether a prescribed measure under the permit complies with the law; rather, the agency has a continuing duty, even after the issuance of the permit, to "ensure that the prescribed measures [under the permit] are actually being implemented after a thorough assessment of the possible adverse impacts the development would have on the State's natural resources." *1250 Oceanside Partners*, 111 Hawai'i at 231, 140 P.3d at 1011.

to weigh competing public and private uses on a case-by-case basis is independent of statutory duties and authorities created by the legislature." *Id.* at 172, 324 P.3d at 982.

**B.**

The public trust doctrine under the Hawai'i Constitution, and the principles that it embodies, applies to the conservation land—the summit of Mauna Kea—involved in this case. This conclusion is supported by the plain language of Article XI, Section 1, the historical context under which this provision was ratified, and this court's precedents.[10]

Construction of constitutional provisions is largely guided by the same principles that courts use in interpreting statutes. Because of the exalted position that constitutional provisions occupy in the constellation of laws that operate in our State, "we have long recognized that the Hawai'i Constitution must be construed with <u>due regard to the intent of the framers and the people adopting it,</u> and the fundamental principle in interpreting a constitutional provision is to give effect to that intent." *Hanabusa v. Lingle,* 105 Hawai'i 28, 31, 93 P.3d 670, 673 (2004) (emphasis added) (quoting *Blair v. Harris,* 98 Hawai'i 176, 178–79, 45 P.3d 798, 800–01 (2002)). Divining intent, however, always starts with the words of the constitutional provision, and it is an elementary precept that "if the words used in a constitutional provision are clear and unambiguous, they are to be construed as they are written." *Id.* (quoting *Blair,* 98 Hawai'i at 179, 45 P.3d at 801). It is also a settled canon that "the words are presumed to be used in their natural sense unless the context furnishes some ground to control, qualify, or enlarge them." *Id.* at 31–32, 93 P.3d at 673–74 (quoting *Blair,* 98 Hawai'i at 179, 45 P.3d at 801). Given that our constitutional provisions exist under one instrument, construction of one provision must be in harmony "with other provisions of the instrument." *Id.* at 32, 93 P.3d at 674 (quoting *Blair,* 98 Hawai'i at 179, 45 P.3d at 801). Finally, the circumstances

under which the provision was adopted and the "history which preceded it" inform judicial construction of the Hawai'i Constitution. *Id.* (quoting *Blair,* 98 Hawai'i at 179, 45 P.3d at 801).

Article XI, Section 1 provides that "the State and its political subdivisions shall conserve and protect . . . all natural resources, including land." Further, "[a]ll public natural resources are held in trust by the State for the benefit of the people." Haw. Const. art. XI, § 1. Thus, it was the express intent of the legislature that the protections afforded by the public trust doctrine extend to one of our most precious natural resources—land. A conclusion that would exclude public lands from the scope of the public trust doctrine would be contrary to the express statements that <u>all</u> public natural resources are held in trust and natural resources <u>include</u> land. Such a result is to be avoided because, as is true in construing statutes, all words of a constitutional provision must be given effect, and "no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." *Blair,* 98 Hawai'i at 179, 45 P.3d at 801 (quoting *Keliipuleole v. Wilson,* 85 Hawai'i 217, 221, 941 P.2d 300, 304 (1997)).

This plain language interpretation is amply supported by the history and development of the public trust doctrine in this State. As discussed, lands in the public domain have always been held, from the time of the Hawaiian Kingdom to the post-statehood era, by the sovereign for the benefit of the people of Hawai'i at large, and this arrangement has always required the sovereign, as a public trustee, to protect and maintain those lands. Concluding that the framers of the 1978 Constitution intended to exclude public lands from the protections of the public trust is not reconcilable with the deep roots of the public trust doctrine in this State, the fact that the doctrine has been repeatedly reaffirmed throughout the State's history, and this court's unwavering adherence to the values

---

**10.** It is noted that the Board acknowledged the applicability of the public trust doctrine in this case: "In assessing the Project and determining whether the criteria of [the Department of Land

and Natural Resources rules] have been satisfied, <u>the State must protect the public trust</u> and the customary and traditional rights and practices of native Hawaiians." (Emphasis added).

that the doctrine encompasses. Such a conclusion would overlook "the circumstances under which [Article XI, Section 1] was adopted and the history which preceded it." *Hanabusa*, 105 Hawai'i at 32, 93 P.3d at 674 (quoting *Blair*, 98 Hawai'i at 179, 45 P.3d at 801). Indeed, if the public trust doctrine were not intended by the framers of the 1978 Constitution to cover lands in the public domain, they could have disavowed such a view by excluding any references to "land" from the express language of Article XI, Section 1. The framers did not do so but, instead, affirmatively included land as a specific example of public "natural resources" covered by the public trust doctrine.

Finally, this court's precedents support the interpretation that the public trust doctrine under Article XI, Section 1 applies to lands in the public domain. As discussed, this court held in *Zimring* that all lands in the public domain are within the public trust, which means that the sovereign is obligated to protect and maintain them and to regulate their use. *Zimring*, 58 Haw. at 121, 566 P.2d at 735 (concluding that the State held lava extensions in public trust for the benefit of the populace). Additionally, in *Morimoto v. Board of Land and Natural Resources*, 107 Hawai'i 296, 113 P.3d 172 (2005), this court implicitly concluded that the public trust doctrine under Article XI, Section 1 applies to conservation district lands. At issue in that case was the propriety of an agency's decision to approve a permit to upgrade a road on the island of Hawai'i that traverses acres of conservation district lands. *Id.* at 297–98, 113 P.3d at 173–74. The circuit court concluded, inter alia, that the Board's decision "d[id] not violate Article [XI], Section 1 of the Hawai'i Constitutional Public Trust Doctrine." *Id.* at 301, 113 P.3d at 177. In addressing the appellants' contention that the agency was required to "affirmatively protect public resources, including natural resources," pursuant to the public trust doctrine, we reviewed the arguments of the appellants in support of this contention and concluded that the arguments were similar to those challenging the agency's alleged failure to follow its own administrative rules—arguments that the court had already considered and rejected; thus, we determined that the

circuit court did not err in concluding that there was no public trust violation on the agency's part. *Id.* Importantly, the court did not conclude that the public trust doctrine was not applicable to land.

Accordingly, based on the plain language of Article XI, Section 1, the application of principles guiding the interpretation of constitutional provisions, the special history of the public trust doctrine in this State, and this court's precedents implicating the public trust doctrine in land cases, the summit area of Mauna Kea, as state conservation land, is within the public trust and entitled to the protections that the public trust doctrine provides.

## C.

The Board's error in this case lies in approving the permit before making specific findings and conclusions on whether the proposed use satisfies all requisites of the public trust doctrine. *See Wai'ola O Moloka'i*, 103 Hawai'i at 432, 83 P.3d at 695. By doing so, the agency decided the merits of UH's application without discharging its affirmative duty of "considering, protecting, and advancing public rights in the resource at every stage of the planning and decision-making process." *1250 Oceanside Partners*, 111 Hawai'i at 231, 140 P.3d at 1011 (quoting *Waiahole I*, 94 Hawai'i at 143, 9 P.3d at 456). That is, the Board issued the permit without "'tak[ing] the initiative' to obtain the information it needs" in order to reach a well-considered decision. *'Iao*, 128 Hawai'i at 262, 287 P.3d at 163. Relatedly, the Board failed to place on UH the constitutional burden of "justify[ing] the proposed ... use in light of the trust purposes." *Kauai Springs, Inc.*, 133 Hawai'i at 173, 324 P.3d at 984.

Accordingly, the Board "compromise[d] public rights in the resource" without adhering to a decision-making process consistent with "a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our [S]tate." *Waiahole I*, 94 Hawai'i at 143, 9 P.3d at 455 (emphasis added). Further, the Board's error was not cured merely by conducting a contested case hearing, through

which findings and conclusions concerning the public trust doctrine were made, after the permit had already issued. Under the facts of this case, such a procedure—which may be viewed, rightly or wrongly—as an attempt to legitimize a foregone conclusion—cannot be considered permissible pursuant to the State's public trust duties when decision-making concerning public-trust resources is involved. *Id.; cf. Kilakila ʻO Haleakala v. Bd. of Land & Nat. Res.*, 131 Hawaiʻi 193, 214, 317 P.3d 27, 48 (2013) (Acoba, J., concurring) (reasoning that "[a]ny post hoc rationale by the agency to justify its earlier decision will not constitute a determination of [the permit applicant's] legal rights or privileges" since those rights had already been decided pursuant to the agency's grant of the permit).

Hence, the Board violated Article XI, Section 1 of the Hawaiʻi Constitution as a matter of law by deciding the merits of UH's application before conducting a contested case hearing in which the public trust doctrine, and the obligations it imposes on the State, could have been duly considered. *See Waiʻola O Molokaʻi*, 103 Hawaiʻi at 432, 83 P.3d at 695 (holding that the agency failed to discharge its public trust obligations by granting water use permits without rendering findings of facts and conclusions of law regarding the applicant's burden under the public-trust balancing framework); *Waiahole I*, 94 Hawaiʻi at 158, 9 P.3d at 470.

### III. Due Process Under Article I, Section 5

The notion that an individual must be accorded sufficient procedural safeguards before being deprived of a "property" interest is a cornerstone of Hawaiʻi law. In *Aguiar v. Hawaii Housing Authority*, 55 Haw. 478, 522 P.2d 1255 (1974), this court explained that a claim of due process requires a two-step inquiry: "(1) is the particular interest which the claimant seeks to protect by a hearing 'property' within the meaning of the due process clauses of the federal and state constitutions, and (2) if the interest is 'property,' what specific procedures are required to protect it." *Id.* at 495, 522 P.2d at 1266. In that case, the issue was "whether the plaintiffs' interest[s] in continuing to receive the benefit of low cost housing and hence in not paying assertedly erroneous rent increases [are] substantial enough to require agency hearings prior to the imposition of the increases." *Id.* at 495, 522 P.2d at 1267 (emphasis added). The court answered in the affirmative, reasoning that the plaintiffs' interests in the statutory benefit of low-cost housing were so substantial that they constituted " 'property interest[s]' for due process purposes." *Id.* at 496, 522 P.2d at 1267. In this light, the court held that (1) the plaintiffs were entitled to a hearing before the state agency could impose rent increases upon them, (2) the agency "must follow the adjudicatory procedures of the [Hawaiʻi Administrative Procedure Act (HAPA) ] prior to increasing rents because of any plaintiff's alleged overincome status," and (3) "[a]ny administrative burden [that following HAPA may] impose on the [agency] is more than offset by the substantial safeguards [it] afford[s] to low-income tenants against erroneous rent increases which may undermine those tenants' very ability to survive." *Id.* at 497–98, 522 P.2d at 1267–68.

With the ratification of Article I, Section 5 of the Hawaiʻi Constitution in 1978, due process principles were reaffirmed by the people of this State. As is relevant here, that provision declares that "[n]o person shall be deprived of life, liberty or property without due process of law." Haw. Const. art. I, § 5 (emphasis added). This court later elaborated upon what constitutes a property interest in *Sandy Beach Defense Fund v. City Council of Honolulu*, 70 Haw. 361, 377, 773 P.2d 250, 260–61 (1989). In that case, the appellants challenged the issuance of a Special Management Area use permit without the agency first conducting a contested case hearing, reasoning that the procedure was violative of constitutional due process. *Id.* at 361, 773 P.2d at 253. This court explained that a due process claim must be grounded in a property interest. *Id.* at 377, 773 P.2d at 260–61. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 377, 773

P.2d at 260 (quoting *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

The *Sandy Beach* court explained that "[t]he basic elements of procedural due process of law require notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of a significant property interest." *Id.* (emphasis added) (citing *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); and *N. Ga. Finishing, Inc. v. Di–Chem, Inc.,* 419 U.S. 601, 605–06, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975)). The court adopted the *Mathews v. Eldridge* framework in determining the precise procedures required to comply with constitutional due process. *Id.* According to the court, several factors must figure in the balancing process: "(1) the private interest which will be affected; (2) the risk of an erroneous deprivation of such interest through the procedures actually used, and the probable value, if any, of additional or alternative procedural safeguards; and (3) the governmental interest, including the burden that additional procedural safeguards would entail." *Id.* (citing *Mathews,* 424 U.S. at 335, 96 S.Ct. 893; and *Silver v. Castle Mem'l Hosp.,* 53 Haw. 475, 484, 497 P.2d 564, 571 (1972)).

In *Pele Defense Fund v. Puna Geothermal Venture,* 77 Hawai'i 64, 881 P.2d 1210 (1994), this court reaffirmed the principle that "[c]onstitutional due process protections mandate a hearing whenever the claimant seeks to protect a 'property interest,' in other words, a benefit to which the claimant is legitimately entitled." *Id.* at 68, 881 P.2d at 1214. That case involved an appeal from a State agency's grant of an applicant's permits to construct geothermal and developmental wells and a power plant. *Id.* at 66, 881 P.2d at 1212. This court found two instances in which a property interest is considered sufficiently substantial so as to trigger due process protections: (1) where an agency denies an applicant's proposed property use and (2) "where the issuance of a permit implicating an applicant's property rights adversely affects the constitutionally protected rights of other interested persons who have followed the agency's rules govern-

ing participation in contested cases." *Id.* at 68, 881 P.2d at 1214 (second emphasis added). The first avenue was not applicable because the agency approved the applicant's proposed property use. *See id.* The second alternative, on the other hand, applied because both of its requirements were satisfied. *See id.* First, certain appellants averred or testified that they were owners of property adjacent to the area where the applicant engaged in construction activities pursuant to the permit issued by the agency and that they had been detrimentally affected by those activities. *Id.* at 70 & n. 14, 881 P.2d at 1216 & n. 14. Second, those appellants followed the procedures imposed by the agency in requesting contested case hearings, including those governing the submission of applications for contested cases pursuant to the rules of the agency. *See id.* at 69, 881 P.2d at 1215.

Recently, in *In re 'Iao Ground Water Management Area High–Level Source Water Use Permit Applications ('Iao),* 128 Hawai'i 228, 287 P.3d 129 (2012), this court considered whether the exercise of traditional and customary Native Hawaiian practices is a property interest deserving of due process protections. *Id.* at 241, 287 P.3d at 142. This court focused its analysis on the second alternative under Puna Geothermal, which would trigger due process protections because the agency was considering the issuance of a permit that could adversely affect constitutionally protected rights of other interested parties. *Id.* at 240, 287 P.3d at 141. Relying on Aguiar, the court emphasized "that 'a benefit which one is entitled to receive by statute constitutes a constitutionally-protected property interest.'" *Id.* at 241, 287 P.3d at 142 (emphasis added) (quoting *Aguiar,* 55 Haw. at 496, 522 P.2d at 1267). Proceeding from this premise, this court found that the exercise of traditional and customary Native Hawaiian rights constitutes a property interest because it has "a statutory basis in the water code." *Id.* at 241–42, 287 P.3d at 142–43 (discussing HRS §§ 174C–101 and 174C–63). Hence, because the water resources implicated in the permit granted by the agency affected the property interest of the appellants in the exercise of Native Hawaiian traditional and customary

practices, the court found that pursuant to constitutional due process, the agency was required to conduct a hearing. *Id.* at 244, 287 P.3d at 145.

In this case, under *Puna Geothermal,* the first avenue that triggers due process protections—an agency's denial of an applicant's proposed use—is inapposite because the Board actually approved UH's proposed use, and the Board's decision did not directly adjudicate any property interest of the appellants. *Cf. Aguiar,* 55 Haw. at 496, 522 P.2d at 1267 (deciding whether one is entitled to the property interest of low-rent public housing). Instead, just like *ʻIao,* this case falls under the second *Puna Geothermal* alternative for finding a property interest inasmuch as the Board's issuance to UH of a permit would affect the appellants' exercise of Native Hawaiian customs and traditions. *See ʻIao,* 128 Hawaiʻi at 240, 287 P.3d at 141. The only difference between *ʻIao* and this case is the venue in which Native Hawaiian customs and traditions are being exercised. Thus, just as the exercise of traditional and customary Native Hawaiian rights was found in *ʻIao* to be a property interest when performed in water resources, the question in this case is whether the exercise of these customs and traditions should receive the same treatment when performed on conservation land. *See id.* at 241, 287 P.3d at 142. Because the exercise of Native Hawaiian customs and traditions on conservation land has a statutory source and because the appellants in this case adhered to the administrative rules for a contested case hearing imposed by the Board, the requirements of *Puna Geothermal* were satisfied.

The statutory source of the appellants' entitlement to exercise Native Hawaiian rights is the "Hawaiian usage exception to the adoption of the English common law" under HRS § 1–1,[11] which was intended "to avoid results inappropriate to the isles' inhabitants by permitting the continuance of native understandings and practices which did not unreasonably interfere with the spirit of the common law." *Kalipi v. Hawaiian Trust Co.,* 66 Haw. 1, 10, 656 P.2d 745, 750–51 (1982). In *Kalipi,* this court concluded that the Hawaiian usage exception is "a vehicle for the continued existence of those customary rights which continued to be practiced and which worked no actual harm upon the recognized interests of others." *Id.* at 12, 656 P.2d at 751–52. Inasmuch as the exercise of Native Hawaiian customs and traditions on the summit of Mauna Kea is statutorily supported by HRS § 1–1, it is a property interest protected by constitutional due process. *See ʻIao,* 128 Hawaiʻi at 241–42, 287 P.3d at 142–43.

The appellants in this case also adhered to the Board's administrative rules with respect to requesting a contested case hearing. In relevant part, Hawaiʻi Administrative Rules (HAR) § 13–1–28 (2009) provides, "When required by law, the board shall hold a contested case hearing upon its own motion or on a written petition of any government agency or any interested person." Additionally, the Board's rules provide as follows with respect to the initiation of a contested case hearing:

(a) On its own motion, the board may hold a contested case hearing. Others must both request a contested case and petition the board to hold a contested case hearing. An <u>oral or written request for a contested case hearing must be made to the board no later than the close of the board meeting</u> at which the subject matter of the request is scheduled for board disposition. An agency or <u>person so requesting a contested case must also file (or mail a postmarked) written petition with the board for a contested case no later than ten calendar days after the close of the board meeting</u> at which the matter was scheduled for disposition. For good cause, the time for making the oral or written request or submitting a written petition or both may be waived.

HAR § 13–1–29 (2009) (emphases added).

During the February 25, 2011 public hearing for the permit, the appellants made oral requests for a contested case hearing. At the conclusion of that public hearing, the Board decided to hold a contested case hearing that would involve parties who made either an oral or written request followed by

---

11. *See supra* note 3.

the submission of a petition and the payment of a filing fee within the timeframe provided by the Board's administrative rules. The appellants thereafter filed their respective written petitions within the ten-day period following the close of the February 25, 2011 public hearing. Thus, the appellants "followed the agency's rules governing participation in contested cases." *Puna Geothermal*, 77 Hawai'i at 68, 881 P.2d at 1214; *see* HAR § 13–1–29; *Tao*, 128 Hawai'i at 234–35, 287 P.3d at 135–36 (stating that several attendees at a public hearing requested a contested case hearing and filed written petitions to that effect); *see also Kilakila 'O Haleakala v. Bd. of Land & Nat. Res.*, 131 Hawai'i 193, 211, 317 P.3d 27, 45 (2013) (Acoba, J., concurring) (discussing how the appellant in that case satisfied the same administrative rules involved in this case by making an oral request for a contested case hearing before the close of a public hearing followed by the submission of a written petition within the ten-day period imposed by the rules).

In view of the fact that the appellants' exercise of Native Hawaiian traditional and customary practices on the summit of Mauna Kea is a property interest under the constitutional due process framework, and because that property interest could be adversely affected by UH's proposed action, the appellants were entitled to a contested case hearing prior to being deprived of their property interest. *Cf. Aguiar*, 55 Haw. at 495–96, 522 P.2d at 1267 (holding that the plaintiffs' interest in low-cost housing was a property interest "substantial enough to require agency hearings prior to the imposition of [rent] increases" (emphasis added)).

The same conclusion is reached under the *Mathews* three-factor balancing test, as adopted by this court in *Sandy Beach*. The interest involved, which is the first *Mathews* factor, *Sandy Beach*, 70 Haw. at 378, 773 P.2d at 261, is the property interest of the appellants of Native Hawaiian ancestry to

practice Native Hawaiian customs and traditions on the summit area of Mauna Kea. The risk of erroneous deprivation of this property interest by virtue of the procedures followed by the Board—the second factor, *id.*—was high because the merits of UH's application were summarily decided without a process ensuring the proper presentation of evidence and a thoughtful deliberation. The procedure that the Board used simply failed to assess the appellants' property interest in light of countervailing considerations relevant to the permitting process. Additionally, the fact that the Board's administrative rules do not appear to provide a procedural vehicle for the Board to reverse its grant of a permit, if it were later found that the permit was improperly granted, elevated the risk of erroneous deprivation.

Also to be considered under the second factor is the probable value of additional or alternative procedures. *Id.* An alternative procedure that was available to the Board was to conduct a contested case hearing prior to granting the permit to UH. This procedure would have allowed the Board to receive evidence, including testimony adduced by the parties, weigh the probative value of such evidence, consider arguments, engage in thorough deliberation, and thereafter make thoughtful findings of fact and conclusions of law based on the evidence. The "probable value" of this alternative procedure is considerable, especially under the facts of this case, where the property interest at stake is as profound as the exercise of Native Hawaiian customs and traditions. That is, as compared to the procedure that the Board actually followed, this alternative procedure substantially lessens the risk of erroneous deprivation.[12]

Finally, the burden that the alternative procedure places on the Board—the final *Mathews* factor, *id.*—is minimal, especially in view of the fact that the property interest implicated in this case has constitutional un-

12. Notably, cases have voiced a preference for predeprivation hearings whenever they are feasible regardless of the merits of a postdeprivation remedy. *See Zinermon v. Burch*, 494 U.S. 113, 132, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) ("In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking."); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).

derpinnings. *See* Haw. Const. art. XII, § 7.[13] It also cannot be reasonably argued that it would have been burdensome for the Board to hold a contested case hearing before issuing the permit since the Board actually conducted such a hearing after the issuance of the permit. In any event, whatever burden the Board must bear because of a pre-issuance contested case hearing is more than outweighed by the protections such procedure provides to the appellants' constitutionally rooted interest in exercising Native Hawaiian customs and traditions. *Cf. Aguiar*, 55 Haw. at 498, 522 P.2d at 1268 (burden imposed on the agency by the procedures that they must follow "is more than offset by the substantial safeguards they afford to low-income tenants against erroneous rent increases which may undermine those tenants' very ability to survive").

Accordingly, the Board should not have granted the permit before holding a contested case hearing because that procedure is inconsistent with the procedural safeguards contemplated by Article I, Section 5 of the Hawai'i Constitution. By deciding UH's application on the merits without the benefit of a contested case hearing, the Board failed to provide the procedural safeguards to which the appellants were constitutionally entitled prior to being deprived of a protected property interest, violating Article I, Section 5 of the Hawai'i Constitution.

## IV. Constitutional Responsibilities of an Agency

Although the power of a State agency is delineated by statute, an agency's statutory duties must be performed in a manner that is consistent with the Hawai'i Constitution.[14] Thus, the agency must function in accordance with both its governing statutes and the Hawai'i Constitution. With respect to the Hawai'i Constitution, an agency's obligation is twofold: the agency must not only avoid infringing upon protected rights to the extent feasible, but it also must execute its statutory duties in a manner that fulfills the State's affirmative constitutional obligations.[15]

In other words, the authority and obligations of an agency are necessarily circumscribed and regulated by the Hawai'i Constitution. *See Czerkies v. U.S. Dep't of Labor*, 73 F.3d 1435, 1441–42 (7th Cir.1996) (stating that "an administrative agency [may not] claim to receive from Congress by sheer inadvertence a license to ignore the Constitution"); *Hennessey v. Indep. Sch. Dist. No. 4*, 552 P.2d 1141, 1145 (Okla.1976) ("All governmental bodies must remain within bounds of the Constitution."); *City of Modesto v. Modesto Irrigation Dist.*, 34 Cal.App.3d 504, 110 Cal.Rptr. 111, 114 (1973) (holding that state agencies "must submit to a constitutional mandate"). Hence, an agency may not fulfill its statutory duties without reference to and application of the rights and values embodied in the constitution.

As a related matter, an agency is often in the position of deciding issues that affect multiple stakeholders and implicate constitutional rights and duties. *See In re 'Iao Ground Water Mgmt. Area High–Level Source Water Use Permit Applications ('Iao )*, 128 Hawai'i 228, 231, 287 P.3d 129, 132 (2012) (deciding water use applications of several parties with a multitude of interests in several water resources); *Ka Pa'akai O Ka'Aina v. Land Use Comm'n*, 94 Hawai'i 31, 34, 7 P.3d 1068, 1071 (2000) (reclassification of approximately 1,000 acres of land from a conservation district to an urban district). As a result, an agency is often the

---

**13.** *Cf. Aguiar*, 55 Haw. at 496, 522 P.2d at 1267 (concluding that a plaintiff is entitled to a predeprivation hearing before being required to pay higher rent for low-cost public housing); *Silver*, 53 Haw. 475, 486, 497 P.2d 564, 572 (1972) (requiring a predeprivation hearing before deciding whether to renew a medical doctor's privileges in a federally funded private hospital). Both *Aguiar* and *Silver* involved property rights not rooted in the Hawai'i Constitution.

**14.** An agency is a creature of the legislature, and the scope of its authority is specifically delineat-

ed by statute. *See Marquette Cement Mfg. Co. v. FTC*, 147 F.2d 589, 592–93 (7th Cir.1945) (emphasizing that "Congress is the creator of all . . . administrative agencies" and that agencies' "jurisdiction and authority . . . is confined solely to that which Congress bestows").

**15.** The Hawai'i Constitution sets out many specific mandates that the State must fulfill. For example, Article XII, Section 7 sets forth the State's obligation to "reaffirm[ ]" and "protect" certain rights of Native Hawaiians.

primary protector of constitutional rights and perhaps is in the best position to fulfill the State's affirmative constitutional obligations.[16] *Cf. Save Ourselves, Inc. v. La. Envtl. Control Comm'n,* 452 So.2d 1152, 1157 (La.1984) (holding that "the rights of the public must receive <u>active and affirmative protection</u> at the hands of the" agency making the decision (emphasis added)). Consequently, an agency bears a significant responsibility of assuring that its actions and decisions honor the constitutional rights of those directly affected by its decisions.

In this case, the Board, which heads the Department of Land and Natural Resources, was asked to perform its statutory duty to consider an application for a permit to build on conservation land. *See* HRS § 183C–6 (2011) ("The department shall regulate land use in the conservation district by the issuance of permits."); HRS § 171–3(a) (Supp. 2008) (stating that the department "shall manage, administer, and exercise control over," inter alia, "public lands, the water resources, ocean waters, navigable streams, coastal areas (excluding commercial harbor areas), and minerals and all other interests therein and exercise such powers of disposition thereof as may be authorized by law"). As recognized by the Administrator of the Office of Conservation and Coastal Lands, the proposed use of the conservation land implicates the constitutional right of individuals of Native Hawaiian descent to exercise traditional and customary Native Hawaiian practices.

Under such facts, the role of an agency is not merely to be a passive actor or a neutral umpire, and its duties are not fulfilled simply by providing a level playing field for the parties. *See Save Ourselves, Inc.,* 452 So.2d at 1157 ("[T]he commission's role as the representative of the public interest does not permit it to act as an umpire passively calling balls and strikes for adversaries appearing before it."). Rather, an agency of the State must perform its statutory function in a manner that fulfills the State's affirmative constitutional obligations. *See, e.g., Ka Pa'akai O Ka'Aina,* 94 Hawai'i at 45, 7 P.3d at 1082 (placing "an affirmative duty on the State and its agencies to preserve and protect traditional and customary native Hawaiian rights"); *In re Water Use Permit Applications (Waiahole I ),* 94 Hawai'i 97, 143, 9 P.3d 409, 456 (2000) (describing the state agency's affirmative duty of "considering, protecting, and advancing public rights in the resource at <u>every stage</u> of the planning and decision-making process"). In particular, an agency must fashion procedures that are commensurate to the constitutional stature of the rights involved, *see, e.g., Waiahole I,* 94 Hawai'i at 143, 9 P.3d at 455 (decisions involving public rights to a public-trust resource must be "made with a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state"), and procedures that would provide a framework for the agency to discover the full implications of an action or decision before approving or denying it, *see, e.g., Kauai Springs, Inc. v. Planning Comm'n of Kaua'i,* 133 Hawai'i 141, 174–75, 324 P.3d 951, 984–85 (2014) (crafting an assistive framework that can guide agencies when considering the application of the public trust doctrine to water resources).

In light of the unique position that an agency occupies, the agency may be at the frontline of deciding issues that involve various interests that implicate constitutional rights. Especially in instances where an agency acts or decides matters over which it has exclusive original jurisdiction, that agency is the primary entity that can and, therefore, should consider and honor state constitutional rights in the course of fulfilling its duties. Furthermore, to the extent possible, an agency must execute its statutory duties in a manner that fulfills the State's affirma-

---

**16.** This is not to say that an agency, like the Board in this case, must assume this role at all times. Given the various powers that the Board wields and the duties that it must fulfill, the Board's role obviously changes depending on the matter, facts, and circumstances presented to it. *Cf. Save Ourselves, Inc. v. La. Envtl. Control Comm'n,* 452 So.2d 1152, 1157 (La.1984) (reasoning that the agency becomes "the representative of the public interest" <u>when acting "as the primary public trustee</u> of natural resources" (emphasis added)). The Board's role as defender and enforcer of constitutional rights is invoked where, as here, an action or decision of the agency implicates certain constitutional rights and values.

tive obligations under the Hawai'i Constitution. An agency is not at liberty to abdicate its duty to uphold and enforce rights guaranteed by the Hawai'i Constitution when such rights are implicated by an agency action or decision.[17]

## V. Conclusion

This case illustrates the interweaving nature of the various provisions of our constitution. When rights as integral as the exercise of Native Hawaiian customs and traditions are implicated by a proposed action, our constitution provides several safeguards that combine to preserve those rights.

In this case, the Board was asked to grant a permit to UH for the construction of an astronomical observatory on the summit of Mauna Kea, an area sacred to Native Hawaiians.[18] Because the project could infringe upon the constitutional right of Native Hawaiians to exercise their customs and traditions, the guarantees of Article XII, Section 7, the public trust obligations of the State under Article XI, Section 7, and the due process protections encompassed by Article I, Section 5 were all triggered to constitutionally safeguard the continued practice of Native Hawaiian customs and traditions.

Under the foregoing constitutional provisions and the precedents of this court, the Board's obligations were to protect Native Hawaiian customs and traditions to the extent feasible, to effectuate the values of the public trust, and to provide a procedure befitting the compelling interests at stake. To perform these obligations, the Board was required to decide UH's application pursuant to a decision-making process that incorporates the rights, values, and duties embodied by the constitutional provisions involved. Instead, the Board failed to conduct a contested case hearing before deciding the merits of UH's application and summarily granted the requested permit without duly accounting for the constitutional rights and values implicated. The Board acted in contravention of the protections of Native Hawaiian customs and traditions provided by Article XII, Section 7; Article XI, Section 7; and Article I, Section 5. Accordingly, as a matter of constitutional law, the permit issued by the Board must be invalidated.

I join in Part IV of this concurring opinion.

---

**17.** The non-delegable nature of an agency's duty to protect and enforce constitutional rights only intensifies the important role that an agency plays. *See Ka Pa'akai O Ka'Aina,* 94 Hawai'i at 51, 7 P.3d at 1088 (holding that "the delegation of the protection and preservation of native Hawaiian practices to [the party petitioning for the reclassification of land] was inappropriate"). In this case, outside of judicial review, no other entity but the Board can preserve constitutional rights involved in the permitting of a proposed use of a conservation land. *See* HRS § 26–15(a) (Supp.2005).

**18.** It has been noted that "[i]n Hawaiian culture, natural and cultural resources are one and the same." Mauna Kea Science Reserve Master Plan V–1 (2000).